## MARTIN v. UNITED STATES.
### No. 6109.

United States Court of Appeals
Fourth Circuit.

Argued June 27, 1950.

Decided July 24, 1950.

C. Carter Lee, Rocky Mount, Va., for appellant.

R. Roy Rush, Asst. U. S. Atty., Roanoke, Va. (Howard C. Gilmer, Jr., U. S. Atty., Roanoke, Va., on brief), for appellee.

Before PARKER, Chief Judge, and SOPER, Circuit Judges, and GILLIAM, District Judge.

SOPER, Circuit Judge.

This appeal was taken from an order of the District Court whereby a Ford automobile belonging to Otis Mason Martin was forfeited under §§ 3321 and 3720 of the Internal Revenue Code, 26 U.S.C.A. §§ 3321, 3720, upon proof that on January 20, 1950 it had been used by Martin with intent to defraud the United States in the removal, deposit and concealment of distilled spirits upon which the tax due the United States had not been paid. The validity of the order is attacked on the ground that the evidence offered to justify the seizure and confiscation of the car was procured in violation of the Fourth Amendment to the Federal Constitution by an unreasonable search without a warrant of Martin's garage which was situated within 60 feet of his residence on the same lot of ground in Roanoke, Virginia. The investigating officer who searched the garage and seized the car and illicit liquor was William Fansler, a probation officer, to whose custody Martin was committed on July 7, 1947, after he had been convicted of violating the federal laws relating to distilled spirits and released on probation by the District Court. It was conceded at the trial that the automobile was properly forfeited if the search was lawful, and the evidence secured under the circumstances now to be related was legally admissible.

Martin had served two sentences imposed by the District Court—one of 30 months in 1939 and one of 6 months in 1942, in Atlanta Penitentiary, for violation of the federal liquor laws. He was convicted again in 1947 for a similar offense and, notwithstanding his previous record, was released on probation because he had had a good record in the armed services in the

Second World War. After he was released on probation, he operated a filling station for a while and later became an automobile mechanic. In 1948, however, the probation officer again received reports that he was involved in illicit liquor operations. A large illicit distillery in Rockbridge County, Virginia, was discovered in September, 1948. Two young men were arrested for operating it and Martin by his own admission paid their fines. Fansler learned of the violation from federal and state officers; and Martin himself told Fansler that although he had never visited the distillery, he had put up money for the operation, had gotten whisky from it and had stored some of it beneath the floor of his garage in which a trap door had been concealed. This matter was duly reported to the court and the probation officer was instructed to warn Martin and keep a watch upon his activities.

In the early part of 1949, Fansler noticed that Martin was driving a Ford car with a racing motor. He sold this car and bought another one which was wrecked in July, 1949 on a road near Mt. Airy, Virginia, with 96 gallons of illicit whisky. Fansler was told that two men escaped from the car and that in the glove compartment there were found an electric light bill in Martin's name and a driving permit in the name of Gladys Martin. The car was registered in another name.

In September, 1949 Fansler learned that Martin had bought a 1940 Ford car and had built it up and put in a racing motor and other attachments. He was then working at a filling station but he frequently went away at night in the car into the country and sometimes did not return home until 4, 5 or 6 o'clock in the morning. In December, 1949 Fansler examined the car on the street near Martin's home and found that it was equipped with a heavy load spring such as is found on cars used in the transportation of illicit liquor but is not desirable for ordinary travel. Fansler also observed that Martin was keeping company and driving at night with one Cauley who was reputed to be a liquor violator.

Fansler kept a close watch on Martin during this period and often-times kept his house under surveillance throughout a large part of the night. On January 19, 1950 he passed the house at 9:30 P.M. and saw Martin's 1950 Ford car and Cauley's 1940 Ford car parked in the driveway. He returned at 11 or 11:30 P.M. and from a position about 40 yards from his house diagonally across the street kept watch throughout the night. At 5:45 A.M. the next morning, Martin and Cauley arrived from the country in Martin's 1940 Ford car and stopped in front of his house near the place where Fansler was concealed. Cauley got out of the automobile and moved the 1950 car since it impeded access to the garage. Fansler, having moved to a position directly in front of the house, noticed the heavy overload spring on the 1940 car and that the car was heavily laden. After the 1950 car was gotten out of the way, Martin turned the laden car and backed it into the garage which Cauley had opened. The headlights of the car were cut off and both men used flashlights and closed the door of the garage. Thereupon Fansler, still in a place of concealment off the premises, heard a dull thud such as would be caused by the opening of the trap-door which Fansler had seen on previous occasions in Martin's presence. Then Fansler heard the screech of the springs of the automobile as if heavy weights were being removed from the car and also heard heavy articles being dragged across the floor.

Being satisfied from his knowledge of Martin's record, from conversations with him, from observation of Martin's nocturnal habits and the appearance of the car and the acts of the men, that the laws were being violated, Fansler entered the yard of the residence and approached the garage and listened for two or three minutes near the door. He heard Martin say that some one should have come for the stuff and heard footsteps going up and down the steps into the trap. Thereupon he opened the garage door and entered. Martin was in the rear compartment of the car and Cauley was going down the steps with a

case of whisky. There were 8 or 9 cases of whisky in fruit jars inside the car, 2 or 3 on the floor of the garage and the remainder of the 26 cases were in the trap. The three men loaded the whisky back into the car and Fansler took possession of it and delivered it to the federal authorities and reported the seizure. He asked Martin and Cauley to appear in court the next day and they consented to do so. Upon this testimony the District Judge revoked Martin's probation and relying upon the same evidence by agreement of the parties, declared a forfeiture of the car upon the petition of the United States.

There is no doubt that the Fourth Amendment protects all persons suspected or known to be offenders as well as the innocent, and it unquestionably extends not only to the persons but also to the houses of the people, whether they be residences or places of business. Go-Bart Imp. Co. v. United States, 282 U.S. 344, 356, 51 S.Ct. 153, 75 L.Ed. 374; Gouled v. United States, 255 U.S. 298, 305, 308–309, 41 S.Ct. 261, 65 L.Ed. 647. The Amendment applies in this case to Martin, a probationer, and to his garage located near his home, although his status is a circumstance to be taken into consideration; but the question remains whether the search and seizure were unreasonable and therefore a violation of the right conferred upon him to be secured against such a search. What is a reasonable search is not to be determined by any fixed formula. The Constitution does not define what are "unreasonable" searches and, regrettably, in our discipline we have no ready litmus-paper test. The recurring questions of the reasonableness of searches must find resolution in the facts and circumstances of each case. United States v. Rabinowitz, 339 U.S. 56, 63, 70 S.Ct. 430. See also Taylor v. United States, 286 U.S. 1, 6, 52 S.Ct. 466, 76 L.Ed. 951; Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436; McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153.

The facts are emphasized in the conflicting contentions of the parties. On the one hand it is pointed out that Martin was a probationer under sentence of the court, undergoing a "mode of mild and ambulatory punishment". Korematsu v. United States, 319 U.S. 432, 435, 63 S.Ct. 1124, 1126, 87 L.Ed. 1497, and subject to arrest for cause wherever found by the probation officer, without a warrant, 18 U.S.C.A. § 3653 as amended. On the other hand, it is shown that Fansler had no warrant for the arrest of Martin or the search of the premises. It can hardly be disputed that Fansler had sufficient cause to arrest the offender without warrant in view of his past record, his admissions of violations of the law, and the suspicious character of his activities during the previous weeks and on the night of the seizure. Nor can it be doubted that the officer having probable cause for the arrest had authority to enter the premises and take the probationer into custody. 6 C.J.S., Arrest, § 14. It was in the performance of this duty and the execution of the express order of the court to keep the man under surveillance that Fansler entered the garage and obtained the evidence that a fresh crime was being committed. It is true that he did not take the offender into physical custody, but he obtained his promise to report to court the next day and he seized the automobile and the fruits of the crime.

It may be doubtful whether these circumstances, coupled with the compliance by the probationer with the officer's notice to appear in court, constituted an arrest within the technical meaning of that term; but it can hardly be maintained that the search was unreasonable, solely because the officer exercised his discretion to notify the probationer to appear rather than detain him physically at the time of the seizure of the car. In other words, the legality of the search under these peculiar circumstances cannot be distinguished on any reasonable basis from the search of the premises of an accused as an incident to the lawful arrest of his person; and this brings us to a consideration of the contention that the lack of a search warrant invalidated the search. The rule in this respect has recently been laid down in United States v. Rabinowitz, 339 U.S. 56, 65–66,

440

70 S.Ct. 430, 435, as follows: "It is appropriate to note that the Constitution does not say that the right of the people to be secure in their persons should not be violated without a search warrant if it is practicable for the officers to procure one. The mandate of the Fourth Amendment is that the people shall be secure against *unreasonable* searches. It is not disputed that there may be reasonable searches, incident to an arrest, without a search warrant. Upon acceptance of this established rule that some authority to search follows from lawfully taking the person into custody, it becomes apparent that such searches turn upon the reasonableness under all the circumstances and not upon the practicability of procuring a search warrant, for the warrant is not required. To the extent that Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663, requires a search warrant solely upon the basis of the practicability of procuring it rather than upon the reasonableness of the search after a lawful arrest, that case is overruled. The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable. That criterion in turn depends upon the facts and circumstances—the total atmosphere of the case. It is a sufficient precaution that law officers must justify their conduct before courts which have always been, and must be, jealous of the individual's right of privacy within the broad sweep of the Fourth Amendment."

The instant case is governed by this decision. Indeed the circumstances present a stronger ground than those in the cited case to sustain the search, in that there was no certainty that the illicit merchandise which had just been concealed in the garage might not be removed therefrom before a judicial officer could be found and a warrant issued. We find no foundation for the accusation that in this case there was an abuse of the constitutional rights of the appellant who had not only received generous treatment from the court but was brought again before it only after an unusual painstaking investigation by its probation officer.

Affirmed.