**UNITED STATES ex rel. Joseph RANDAZZO, Petitioner-Appellant,**

v.

**Harold W. FOLLETTE, Warden of Green Haven Prison, Stormville, New York, Respondent-Appellee.**

No. 86, Docket 32323.

United States Court of Appeals
Second Circuit.

Argued Nov. 14, 1969.

Decided Dec. 4, 1969.

Peter Lushing, New York City (Milton Adler, The Legal Aid Society, New York, New York, of counsel), for appellant.

Joel H. Sachs, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen., Samuel A. Hirshowitz, First Asst. Atty. Gen., Hillel Hoffman, Asst. Atty. Gen., Frank I. Strom, II, Deputy Asst. Atty. Gen., of State of New York, of counsel), for appellee.

Before MOORE, KAUFMAN and HAYS, Circuit Judges.

HAYS, Circuit Judge:

A judgment of conviction was entered against appellant Joseph Randazzo in 1962 in Supreme Court, New York County upon a plea of guilty[1] to a charge of violation of the statutes dealing with narcotics.[2] Before he pleaded

---

1. The fact that appellant pleaded guilty in the state court does not preclude resort to the federal courts. United States ex rel. Rogers v. Warden, 381 F.2d 209 (2d Cir. 1967).

2. Appellant had been indicted for possession of narcotic drugs and possession of narcotic drugs with intent to sell. He pleaded guilty to the lesser included offense of attempted possession of narcotic drugs.

guilty, appellant moved to suppress evidence consisting of thirty-one ounces of heroin seized at the time of his arrest, claiming that this evidence was obtained in violation of his rights under the Fourth Amendment. After a hearing, the motion was denied. People v. Randazzo, 37 Misc.2d 80, 234 N.Y.S.2d 740 (Sup.Ct.1962). Appellant appealed to the Appellate Division, People v. Randazzo, 20 A.D.2d 850, 248 N.Y.S.2d 203 (1st Dept. 1964) and, upon the denial of that appeal, to the Court of Appeals where the judgment was again affirmed. People v. Randazzo, 15 N.Y.2d 526, 254 N.Y.S.2d 99, 202 N.E.2d 549 (1964) (Fuld, J. dissenting). The United States Supreme Court denied certiorari. Randazzo v. New York, 381 U.S. 953, 85 S.Ct. 1810, 14 L.Ed.2d 725 (1965).

Appellant then applied to the United States District Court for the Southern District of New York for a writ of habeas corpus. The court dismissed the petition, United States ex rel. Randazzo v. Follette, 282 F.Supp. 10 (S.D.N.Y. 1968), but granted a certificate of probable cause. This appeal was taken from the order dismissing the writ.

## I.

Appellant was a parolee under the supervision of the New York State Division of Parole at the time of his arrest.[3] On or about July 8, 1962 Senior Parole Officer John J. McCarthy received information from what he testified was a reliable source that appellant had consorted with a convicted felon; that he maintained late hours; that he apparently was not working; that he had visited a bar late at night; and that he might be involved in the narcotics traffic.

Any one of these activities was sufficient to constitute a violation of parole.[4]

---

3. In 1949, upon his conviction for manslaughter in the first degree in the Court of General Sessions, New York County, appellant was sentenced to state prison for a term of six to twenty years. After having once been paroled and returned for a parole violation, appellant was paroled for the second time in 1957.

4. 9 N.Y.C.R.R. § 155.15 contains the terms required to be included within the parole agreement:

155.15 Contents of parole and mandatory release agreement. (a) Upon his release, a paroled person must proceed directly to the place to which he has been paroled and within a period of 24 hours must make his arrival report. At the time he reports to the proper area office or to the proper parole officer he must have in his possession the money he received at the time of his release, except the funds expended for necessary travel, food and shelter.

(b) He must not leave the State of New York or the community to which he has been paroled without the written permission of his parole officer.

(c) He must carry out the instructions of his parole officer, report as directed and permit the parole officer to visit him at his residence and place of employment. The parolee must not change his residence or employment without first securing the permission of his parole officer. The parolee understands that he is still in the custody of the superintendent or warden of the institution from which he is being paroled. He hereby consents to any search of his person, his residence, or of any property or premises under his control which the Board of Parole or any of its representatives may see fit to make at any time in their discretion.

(d) He must make every effort to maintain gainful employment and, if for any reason he loses his position, he must immediately report this fact to his parole officer and he must cooperate with his parole officer in the officer's efforts to obtain employment for him. He must conduct himself as a good citizen, must not associate with evil companions or individuals having criminal records. He must abstain from wrong-doing, lead an honest, upright and industrious life, support his dependents, if any, and assume toward them all legal and moral obligations. His behavior must not be a menace to the safety of his family or to any individual or group of individuals.

(e) He must avoid the excessive use of intoxicating beverages and abstain completely if so directed by his parole officer.

(f) He must not live as man and wife with anyone to whom he is not legally married, and must not have sex relations with anyone not his lawful

McCarthy brought the situation to the attention of Area Director Paul D. Travers who issued a "Warrant for Retaking and Detaining a Paroled Prisoner"[5] on July 10, 1962. The warrant was turned over to William Quinn, a parole officer, on July 12, 1962 with instructions to execute it in cooperation with Officer D'Apre of the New York City Police Department.

On that day, at about 5:10 P.M., Quinn, D'Apre and another officer took up a position outside appellant's residence. Appellant arrived by taxicab about a half hour later and was approached by Quinn and one of the officers. They accompanied appellant to his third floor apartment where he admitted having consorted with a known criminal. Quinn then arrested appellant, searched his person and asked him "what room do you sleep in?" Appellant pointed to his bedroom. Quinn searched the room

---

spouse. He must obtain written permission from his parole officer before he applies for a license to marry.

(g) Immediately after his release on parole he must surrender any motor vehicle license which he had in his possession at the time of his conviction and sentence. While on parole he must not apply for a motor vehicle license, or own or operate a motor vehicle without permission of his parole officer. If, while on parole, a parolee purchases a motor vehicle without a valid license, it will be considered a violation of parole. A valid license will be deemed to be one issued subsequent to release on parole after permission has been obtained.

(h) If a parolee carries firearms of any nature, it will be considered a violation of parole.

(i) A paroled person must not carry from the institution from which he is released, or send to any penal institution, whether in the State of New York or elsewhere, any written or verbal message, or any object or property of any kind whatsoever, unless specific permission to do so has been obtained from the warden, superintendent, or other duly authorized officers of both the institution from which he is released and the institution to which the message, object, or property is to be delivered, and he must not correspond with inmates of correctional institutions without the written permission of his parole officer.

(j) He must reply promptly to any communication from a member of the Board of Parole, a parole officer, or other authorized representative of the Board of Parole.

(k) Any reports, either verbal or written, made or submitted by a parolee to a parole officer, which are subsequently found to be false, will be rejected by the Board of Parole, and will not be used in crediting parole time served and may be considered a violation of parole.

(l) A parolee must report to his parole officer each and every time he is arrested or questioned by officers of any law enforcement agency and must state to the parole officer all the facts and circumstances which brought about the arrest or questioning.

(m) As the right of franchise is revoked when a person is sentenced to a State prison, a person released on parole from an indeterminate or definite sentence to State prison, or from an indeterminate sentence with a commitment to the Elmira Reception Center, must not register as a voter and must not vote in any primary, special or general election.

(n) No parolee can accept employment in any capacity where liquor is made or sold without the written approval of the State Liquor Authority permitting such employment.

(o) Before being released on parole a parolee must agree in writing that if he is arrested in another State while on parole, he will waive extradition and will not resist being returned by the Board of Parole to the State of New York.

(p) In addition to these general rules of parole which all prisoners released on parole must adhere to, the Board of Parole has the authority in any case to impose additional or special conditions of parole.

The last sentence in subparagraph (c), which required that the parolee consent to searches as a *quid pro quo* for the grant of parole, was added after the date appellant's parole agreement was executed.

5. Such a warrant is issued pursuant to statutory authority derived from N.Y. Correction Law § 216 (McKinney's Consol.Laws, c. 43, 1968).

and found in it the thirty-one ounces of heroin.[6]

## II.

Appellant contends on this appeal that the search and subsequent seizure of the heroin violated his rights under the Fourth Amendment. We do not agree and affirm on the ground that the search was valid as incident to a lawful arrest.[7]

■ Appellant was arrested in his apartment pursuant to a "Warrant for Retaking and Detaining a Paroled Prisoner." Such a warrant is designated as "administrative." Its issuance does not depend upon a showing of probable cause. Appellant argues that these factors prevent us from upholding the search and seizure as incident to a lawful arrest.

The standards for the issuance of such a warrant are set out in the statute:

"If the parole officer having charge of a paroled prisoner * * * shall have reasonable cause to believe that such prisoner has lapsed, or is probably about to lapse, into criminal ways or company, or has violated the conditions of his parole in an important respect, such parole officer shall report such fact to a member of the board of parole or to any officer of the division of parole designated by such board, who thereupon may issue a warrant for the retaking of such prisoner and for his temporary detention or return to a designated prison. * * *" N. Y. Correction Law § 216 (McKinney 1968).[8]

Thus the parole officer must have "reasonable cause to believe" a violation or lapse by the parolee has occurred or is about to take place. He cannot issue the warrant but must turn the information over to a superior in the Division of Parole for a determination of whether a warrant should be issued.

■ While the safeguards accorded under this statutory scheme are not as extensive as those required to obtain a warrant for the arrest of an ordinary citizen, they appear to us to be sufficient to provide for the lawful arrest of a parolee.

■ In the instant case there were grounds for the parole officer to believe appellant was in violation of his parole agreement. Indeed before the warrant was executed he admitted that he had consorted with a known criminal. The procedures required by the statute were followed and the arrest was therefore lawful.

6. Appellant's version of the circumstances surrounding his arrest differs substantially from Quinn's testimony. Appellant claimed that he was arrested by the police and first saw Quinn fifteen minutes later when the parole officer came to his apartment. He also testified that the police officers made the search and that Quinn only "looked around a drawer or two." The state court credited Quinn's testimony. People v. Randazzo, 37 Misc. 2d 80, 234 N.Y.S.2d 740 (Sup.Ct.1962).

7. The decision of the district court was based primarily on its conclusion that: "[A] search by a parole officer of the person, residence, or effects of a parolee is not in violation of the Fourth Amendment because done without a warrant, without consent, and without probable cause." 282 F.Supp. at 15.
It is possible that this formulation is too broad. A parolee is said to be entitled to some quantum of Fourth Amendment protection against "unreasonable searches and seizures." See e. g. United States v. Hallman, 365 F.2d 289 (3d Cir. 1966); Brown v. Kearney, 355 F.2d 199, 200 (5th Cir. 1966) (per curiam); Martin v. United States, 183 F.2d 436, 439 (4th Cir.), cert. denied, 340 U.S. 904, 71 S.Ct. 280, 95 L.Ed. 654 (1950) (probationer).
However, a search which would be "unreasonable" if an ordinary citizen were involved, might be reasonable if directed against a parolee. It would be unrealistic to ignore the fact that parolees, as a class, pose a greater threat of criminal activity than do ordinary citizens.

8. 9 N.Y.C.R.R. § 155.17 defines a designated officer as "a senior parole officer or any officer of the Division of Parole holding a title above senior parole officer and shall include any officer who is designated by a superior to act in any of the prescribed titles."

In holding the search valid as incident to this lawful arrest we find support in Abel v. United States, 362 U. S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960). There an arrest was made on the basis of an administrative warrant issued by the United States Immigration and Naturalization Service upon a prima facie showing of deportability. *Id.* at 236–237. A search and seizure made at the time of the arrest was held valid as incident to that arrest.

Appellant claims, as did the petitioner in *Abel,* that the warrant was issued solely as a ploy to validate what would have otherwise been an illegal search. This argument was rejected in *Abel* and in the instant case the record does not support appellant's contention.

Appellant also contends that the search was invalid as overly broad in scope. After the arrest, Parole Officer Quinn first searched appellant's person. He then began his search of the apartment in the room where appellant indicated that he slept. It was there that the heroin was found. Under the standards prevailing at the time the search was made, appellant's bedroom would have been considered among "the premises under his immediate control." Harris v. United States, 331 U.S. 145, 151, 67 S.Ct. 1098, 1101, 91 L.Ed. 1399 (1947); see United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950). Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), if applicable, would require a different result. But this search took place on July 12, 1962 and as this court held in United States v. Bennett, 415 F. 2d 1113 (2d Cir.1969) "we do not regard *Chimel* as applicable to searches (other than that in *Chimel* itself) prior to June 23, 1969."

Affirmed.

KAUFMAN, Circuit Judge (concurring):

I have some doubts about the basis upon which the administrative arrest warrant issued in this case. Thus I prefer to concur on the ground that Randazzo's admission that he consorted with criminals sufficed to provide probable cause for his subsequent arrest, and that the search following it was acceptable— though marginally so—under pre-*Chimel* law.