**UNITED STATES of America ex rel. Herbert SPERLING, Relator-Appellant,**

v.

**Walter V. FITZPATRICK, Warden, West Street House of Detention, Respondent-Appellee.**

**No. 279, Docket 33780.**

United States Court of Appeals, Second Circuit.

Argued Nov. 13, 1969.

Decided May 12, 1970.

George L. Santangelo, New York City (Santangelo & Santangelo, New York City, of counsel), for relator-appellant.

John H. Gross, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty. for the Southern District of New York, Jay Gold, Asst. U. S. Atty., of counsel), for respondent-appellee.

Before LUMBARD, Chief Judge, and KAUFMAN and HAYS, Circuit Judges.

HAYS, Circuit Judge.

Appellant Herbert Sperling appeals from an order of the United States Dis-

trict Court for the Southern District of New York denying without a hearing his application for a writ of habeas corpus.

## I.

■ Appellant was a mandatory releasee subject to the supervision of the United States Board of Parole.[1] On June 8, 1968, two New York City police officers unlawfully searched appellant and another man and took from appellant's possession a loaded .38 caliber pistol.[2] On June 27, 1968 the Board of Parole, upon an application setting forth information as to this incident, issued a warrant for the retaking of appellant as a mandatory release violator.[3] Appellant surrendered himself to his Parole Officer and on October 25, 1968, a mandatory release revocation hearing was held before an examiner designated by the Board of Parole pursuant to 18 U.S. C. § 4207 (1964). Appellant appeared and was represented by counsel. The warrant application and a police report substantiating the information contained in the application were introduced into evidence. The examiner found that on June 8, 1968, appellant was in possession of a .38 caliber loaded pistol in violation of the conditions of his release,[4]

1. In 1960, upon his conviction on charges of selling narcotics and conspiracy to do so, appellant was sentenced in the United States District Court for the Eastern District of New York to a term of ten years imprisonment. On September 23, 1966, appellant was released from prison pursuant to 18 U.S.C. § 4163 (1964), which mandates release at the expiration of the prisoner's term of sentence "less the time deducted for good conduct." Appellant was thereupon "deemed as if released on parole" and subject to the jurisdiction of the United States Board of Parole until August 22, 1969, the date of "expiration of the maximum term * * * for which he was sentenced less one hundred and eighty days." 18 U.S.C. § 4164 (1964).

2. The court below assumed that the search was unlawful, and the government does not strenuously urge on appeal that it was not. No hearing has been held on the legality of the search. On the basis of the evidence seized, appellant and the other man were indicted in Supreme Court, New York County, for felonious possession of heroin and weapons. A motion was made to suppress the evidence, and the indictment was thereafter dismissed.

3. The warrant was properly issued pursuant to 18 U.S.C. § 4205 (1964) upon application of Joseph N. Shore, Parole Executive, and upon information submitted by Matthew Terrizzi, Probation Officer. See Hyser v. Reed, 115 U.S.App.D.C. 254, 318 F.2d 225, 240–241 (en banc), cert. denied sub nom. Jamison v. Chappell, 375 U.S. 957, 84 S.Ct. 447, 11 L.Ed.2d 316 (1963). The warrant application read, in pertinent part, as follows:

"Herbert Sperling was arrested on 6/8/68 at about 4:45 a. m. at the South-east corner of 48th Street and 3rd Avenue, New York, New York, by New York City Detectives. Sperling was observed to remove a manila envelope from the trunk of his parked car which bore license number NY 1121 QX and hand it to codefendant Alphonso Sisca who then placed it on the front seat of his parked vehicle which carried license number NY 6028 XL. The arresting officers then stopped both men, identified themselves and then 'frisked' Sperling and Sisca.

Detective Lee took a loaded .38 caliber pistol from Herbert Sperling. Detective Lennon seized the manila envelope from the front seat of Sisca's car and found it it (sic) to contain more than one ounce of heroin. Detective Lee seized a manila envelope from the trunk of Sperling's car and that envelope also contained more than an ounce of heroin. Detective Lennon seized from the trunk of Sisca's car a loaded .38 caliber revolver.

Both men were charged with the offense of Felonious Possession of Narcotics and Possession of Weapons and were arraigned the same date in the Criminal Court, Manhattan.

Information has been submitted by USPO Terrizzi, Southern District of N.Y., in his report of June 20, 1968."

4. 18 U.S.C. § 4203 (1964) authorizes the release of a prisoner "upon such terms and conditions * * * as the Board shall prescribe." One of the terms and conditions of appellant's release was that he would not have in his "possession any firearm or other dangerous weapon without the written permission of [his] Probation Officer, following prior approval of the Board of Parole."

and upon the examiner's recommendation the Board of Parole revoked appellant's release.

## II.

■ Appellant contends that the Board of Parole could not use the fruits of an unlawful search and seizure as evidence to prove a violation of parole. We cannot accede to this contention and affirm the denial of appellant's petition for a writ of habeas corpus on the ground that the exclusionary rule is not applicable in a parole revocation proceeding.

■ The Board of Parole's action in revoking appellant's mandatory release was authorized by 18 U.S.C. § 4207 (1964).[5] In determining whether a mandatory releasee has violated any of the conditions under which he was released, the Board may consider information from any reliable source and if "satisfactory evidence is presented to the Board, a warrant may be issued and the offender returned to an institution." Parole Board Directive No. 1, 28 C.F.R. § 2.35 (1969). The Parole Board is thus vested with the broadest discretion consistent with due process to act upon reliable evidence in revoking parole. See Hyser v. Reed, 115 U.S.App.D.C. 254, 318

F.2d 225, 242 (*en banc*), cert. denied sub nom. Jamison v. Chappell, 375 U.S. 957, 84 S.Ct. 447, 11 L.Ed.2d 316 (1963). Appellant does not dispute that there was reliable evidence that he had possession of a loaded pistol in violation of one of the conditions of his release.

The exclusionary rule is believed to be a necessary restraint on the adversarial zeal of law enforcement officials.[6] "As it serves this function, the rule is a needed, but grudgingly taken, medicament; no more should be swallowed than is needed to combat the disease." Amsterdam, Search, Seizure, and Section 2255: A Comment, 112 U.Pa.L.Rev. 378, 389 (1964).

■ A parole revocation proceeding is not an adversarial proceeding. A parolee remains, "while on parole, in the legal custody and under the control of the Attorney General." 18 U.S.C. § 4203 (1964); Anderson v. Corall, 263 U.S. 193, 196, 44 S.Ct. 43, 68 L.Ed. 247 (1923). A parole revocation proceeding is concerned not only with protecting society, but also, and most importantly, with rehabilitating and restoring to useful lives those placed in the custody of the Parole Board.[7] To apply the exclusionary rule to parole revocation proceedings would tend to obstruct the pa-

---

5. § 4207 provides:

"*Revocation upon retaking parolee.*

A prisoner retaken upon a warrant issued by the Board Parole, shall be given an opportunity to appear before the Board, a member thereof, or an examiner designated by the Board.

The Board may then, or at any time in its discretion, revoke the order of parole and terminate such parole or modify the terms and conditions thereof.

If such order of parole shall be revoked and the parole so terminated, the said prisoner may be required to serve all or any part of the remainder of the term for which he was sentenced."

6. The Supreme Court has held the exclusionary rule applicable in forfeiture proceedings, where the "object, like a criminal proceeding, is to penalize for the commission of an offense against the law." One 1958 Plymouth Sedan v. Commonwealth of Pennsylvania, 380 U.S. 693,

700, 85 S.Ct. 1246, 1250, 14 L.Ed.2d 170 (1965). Lower federal courts have extended it to civil actions prosecuted by the Government. See Pizzarello v. United States, 408 F.2d 579, 585–586 (2d Cir. 1969) (tax assessment case); Powell v. Zuckert, 125 U.S.App.D.C. 55, 366 F. 2d 634, 640 (1966) (discharge proceeding against government employee); Rogers v. United States, 97 F.2d 691 (1st Cir. 1938) (action to recover customs duties).

7. The significance of this distinction is pointed up by the Supreme Court's decision in Williams v. New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), where the Court held that it would be contrary to modern penological policies to extend to a convicted criminal offender the right to confront the witnesses against him in post-trial sentencing procedures. But see Verdugo v. United States, 402 F.2d 599, 610–613 (9th Cir. 1968).

role system in accomplishing its remedial purposes.

There is no need for double application of the exclusionary rule, using it first as it was used here in preventing criminal prosecution of the parolee and a second time at a parole revocation hearing. The deterrent purpose of the exclusionary rule is adequately served by the exclusion of the unlawfully seized evidence in the criminal prosecution.

■ Parolees are, of course, not without constitutional rights,[8] and there is always the possibility of police harassment. However, instances of such harassment can be treated as they arise.[9] Appellant does not suggest that he was the object of any harassment.

Finally, we note that the police officers who subjected appellant to the unlawful search may be subjected to both federal and state penalties.[10] While *Mapp* found these remedies an ineffectual safeguard in the context of criminal proceedings, we see no reason why they may not prove effective in circumstances such as those presented in this case. And if they do not, it would seem sounder policy to strengthen the efficacy of these sanctions rather than to vitiate the penological effectiveness of the Parole Board through the imposition of an inflexible exclusionary rule.

Affirmed.

LUMBARD, Chief Judge (concurring).

■ I concur in the result reached by Judge Hays in this case of first impression in this Circuit. I do so because I believe that the confines within which the parole portion of the criminal justice system operates allow no other practical result.

Ideally, the parole officer in our system serves a dual function. First, he should counsel the paroled prisoner and assist him in the specialized and difficult task of rehabilitation. Second, he should of course be familiar with the activities of parolees within his ambit of responsibility so that they may be assisted to abide by the conditions of parole, and if they fail to do so, he can in suitable cases recommend revocation of the parole status. To discharge these functions effectively requires highly subjective knowledge of each parolee committed to the parole officer's supervision. As with other procedures in the correctional segment of the criminal justice system, the parole offices are overworked and inadequately funded.[1]

---

8. See Hyser v. Reed, *supra*, 318 F.2d at 243; United States v. Hallman, 365 F.2d 289, 291 (3d Cir. 1966); Brown v. Kearney, 355 F.2d 199 (5th Cir. 1966) (per curiam); Martin v. United States, 183 F.2d 436, 439 (4th Cir.), cert. denied, 340 U.S. 904, 71 S.Ct. 280, 95 L.Ed. 654 (1950) (probationer).

9. See Abel v. United States, 362 U.S. 217, 240, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960).

10. 18 U.S.C. § 242 (Supp. IV, 1965–68) imposes a fine of not more than $1,000 and/or imprisonment for not more than one year upon anyone who, acting under color of law, subjects another to a deprivation of rights. *Cf.* 18 U.S.C. § 2236 (1946) (similar penalties for unlawful search by federal officer).

New York Penal Law § 195.00 (McKinney's Consol.Laws, c. 40, 1967) provides that a public servant is guilty of misconduct, a class A misdemeanor, whenever, "with intent to * * * deprive another person of a benefit: 1. He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized * * *."

One who has been subjected to unlawful search and seizure may sue under 42 U.S.C. § 1983 (1964) or bring a state damage action for trespass.

1. See President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Corrections, 6, 70, 97 (1967) (hereinafter "Task Force Report"). The Task Force Report states that in the supervision of convicted felons who were either paroled or placed on probation, "the number of probation and parole officers needed in 1965 was three times the number then employed. [Number employed—5,081; number needed—15,600.] This increase would reduce caseloads from their present high levels

The result is that both the rehabilitative and protective functions suffer from the inattention to individual parolees which must follow from a heavy caseload. In the present case, where such facts as we have indicate that Herbert Sperling had no desire to be successfully rehabilitated, we see the effect which this neglect has on the parole officer's function as a firm supervisor and protector of society. Federal parole officers must rely on city and state law enforcement officials to provide them with information of the most important kind concerning the conduct of parolees. There can be no doubt that if Sperling's parole officer had chanced to see Sperling and his companion Sisca transferring a manila envelope at the corner of 48th Street and Third Avenue at 4:45 A.M. he would have been entirely justified in inquiring what Sperling was up to, and, if unsatisfied with the reply, in conducting a search.

I would be willing, as Judge Kaufman suggests, to test the constitutional reasonableness of searches of parolees conducted by or at the direction of parole officers under less stringent standards than those applied to policemen searching the general citizenry. However, I do not believe that the time for such an approach has come. To apply the exclusionary rule in the context of parole revocation hearings at the present time would merely exacerbate the problems discussed above; to import fourth amendment suppression law into this process would in fact be counterproductive. Parole officers would be forced to spend more of their time personally gathering admissible proof concerning those parolees who cannot or will not accept rehabilitation. Time devoted to such field work necessarily detracts from time available to encourage those parolees with a sincere desire to avoid the all-too-familiar cycle of recidivism. An even greater potential loss would be in the time available to counsel and supervise—particularly in the early months—those who leave confinement with the question of rehabilitation in real doubt.

[see Task Force Report, pp. 98–99, Figure 1, indicating that two-thirds of the convicted felons on probation were supervised by probation officers whose caseload exceeded 100 probationers] * * * to an average of 35 per officer, and in addition would provide sufficient officers to perform essential presentence investigations." *Id.* at 97.

See Dawson, Sentencing: The Decision as to Type, Length, and Conditions of Sentence 317–338 (1969). Professor Dawson notes the obvious fact that parole supervision objectives often conflict with each other, and that this is "particularly likely with respect to the control and treatment objectives." *Id.*, 317. Later, discussing the intensity of parole supervision, Professor Dawson states that the "objectives actually pursued in parole supervision depend in part upon the amount of time the parole officer has to supervise a parolee. Presumably, as available time increases, greater emphasis can be placed on treatment instead of control and more use can be made of supervision techniques other than the routine office interview. Correctional literature would suggest that the intensity of parole supervision, normally expressed in terms of the size of the caseload of each parole officer, is the major problem in current parole supervision."

*Id.* at 332. See also Adams, Some Findings from Correctional Caseload Research, 31 Federal Probation 48 (December 1967).

In an introduction to the 1968 edition of his Sourcebook on Probation, Parole and Pardons, Professor Charles L. Newman, head of the Center for Law Enforcement and Corrections at The Pennsylvania State University, states:

"Many problems still remain unsolved, not least among which is the continuing deficit of adequate numbers of personnel with the appropriate educational preparation and training to carry out the mission of the administration of justice. Hopefully, the work of the Joint Commission on Correctional Manpower and Training will provide some insights on solving the manpower problem in corrections. Adequate funding continues to be a problem, even though the total dollar appropriation to the correctional field increased remarkably in the past decade."

Newman, Sourcebook on Probation, Parole and Pardons, viii (1968).

Although I am somewhat skeptical about the effectiveness of "other remedies" to deter police misconduct, I must agree with Judge Hays that a double application of the exclusionary rule is not warranted at the present time. I draw this conclusion by balancing the interests of all parolees in securing administration of the parole system which is as nearly consonant with its dual goals as is possible at present levels of staffing and funding against the interest of individual parolees like Sperling in not being subjected to a search by local police officers which the government seems to concede was unconstitutional under traditional standards. The time may come when the balance will shift. Proof of widespread police harassment of parolees would cause such a shift since the exclusionary rule is a deterrent which should be used when the need for deterrence is clearly shown. But on the facts of the present situation, I am unwilling to strike a balance which could achieve little, other than a distortion of the priorities of the parole system.

IRVING R. KAUFMAN, Circuit Judge (concurring in the result).

█ I concur in the result reached in my brother Hays's opinion, and in much of what my brother Lumbard says in his concurring opinion. I add only a few words to indicate what I believe would be the preferred manner to resolve the conflicts in purpose and means bared by this case.

There is not, I take it, any basic dispute over the proposition that one is not divested of all his constitutional rights once he is sent to prison. See e. g., Wright v. McMann, 387 F.2d 519 (2d Cir. 1967); United States ex rel. Schuster v. Herold, 410 F.2d 1071 (2d Cir. 1969). Cf. Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947). Nor is there any question of the validity of the principle that "[t]he Bureau of Prisons and the Parole Board operate from the basic premise that prisoners placed in their custody are to be rehabilitated and restored to useful lives * * *." Hyser v. Reed, 115 U.S.App.D.C. 254, 318 F.2d 225, 237 (1963) (en banc), cert. denied, Jamison v. Chappell, 375 U.S. 957, 84 S.Ct. 447, 11 L.Ed.2d 316 (1963). See also Note, Constitutional Law: Parole Status and the Privilege Concept, 1969 Duke L.J. 139, 142–43. In order to effectuate these purposes, the United States Parole Board is vested with broad discretion to set the terms and conditions on which a parolee may be released. See 18 U.S.C. § 4203 (1964).[1] That

1. Present conditions, which are the same for youthful offenders, ordinary parolees, and mandatory releasees like Sperling, are set out on the reverse side of the parolee's certificate of parole and are as follows:

CONDITIONS OF PAROLE

1. You shall go directly to the district shown on this CERTIFICATE OF PAROLE [underlined words deleted on form for mandatory releasee] (unless released to the custody of other authorities). Within three days after your arrival, you shall report to your adviser if you have one, and to the United States Probation Officer whose name appears on this Certificate.

2. If you are released to the custody of other authorities, and after your release from physical custody of such authorities, you are unable to report to the United States Probation Officer to whom you are assigned within three days, you shall report instead to the nearest United States Probation Officer.

3. You shall not leave the limits fixed by this CERTIFICATE OF PAROLE without written permission from the probation officer.

4. You shall notify your probation officer immediately of any change in your place of residence.

5. You shall make a complete and truthful written report (on a form provided for that purpose) to your probation officer between the first and third day of each month, and on the final day of parole. You shall also report to your probation officer at other times as he directs.

6. If in any emergency you are unable to get in touch with your parole adviser, or your probation officer or his office, you shall communicate with the United

authority extends with equal force to mandatory releasees, who are "deemed as if released on parole." 18 U.S.C. § 4164 (1964). Courts presented with the question of determining what conditions may be imposed on a parolee have deferred to the judgment of the Parole Board. See, e. g., United States v. Binder, 313 F.2d 243 (6th Cir. 1963). See also Note, Parole Revocation in the Federal System, 56 Geo.L.J. 705, 707–709 (1968). Such deference is justified not only on the ground that Congress has given the Parole Board wide discretion in this instance, but because the underlying policy of parole—to restore the individual to productive citizenship—demands uniform and expert treatment, which the Board is believed best equip-

ped to provide. Hence if I were presented with a case in which a condition of parole required the parolee to give a satisfactory account of himself to parole officers, or to permit a search of his person by parole officers, I would be inclined to give that determination by the Parole Board considerable weight. See Holtzoff, The Power of Probation and Parole Officers to Search and Seize, 31 Federal Probation 3, 7 (December 1967) (suggesting consent to searches as a condition of parole).[2] In such circumstances we could safely assume that the Board has fully weighed the competing considerations of public safety and personal rehabilitation, and had arrived at what it, in its informed discretion, believed to be the proper resolution. We

States Board of Parole, Department of Justice, Washington, D. C. 20537.

7. You shall not violate any law. You shall get in touch immediately with your probation officer or his office if you are arrested or questioned by a law-enforcement officer.

8. You shall not enter into any agreement to act as an "informer" or special agent for any law-enforcement agency.

9. You shall work regularly unless excused by your probation officer and support your legal dependents, if any, to the best of your ability. You shall report immediately to your probation officer any changes in employment.

10. You shall not drink alcoholic beverages to excess. You shall not purchase, possess, use, or administer marihuana or narcotic or other habit-forming or dangerous drugs, unless prescribed or advised by a physician. You shall not frequent places where such drugs are illegally sold, dispensed, used or given away.

11. You shall not associate with persons who have a criminal record unless you have permission of your probation officer. Nor shall you associate with persons engaged in criminal activity.

12. You shall not have firearms (or other dangerous weapons) in your possession without the written permission of your probation officer, following prior approval of the United States Board of Parole.

I have read, or had read to me, the foregoing conditions of parole. I fully understand them and know that if I violate any of them, I may be recom-

mitted. I also understand that special conditions may be added or modifications of any condition may be made by the Board of Parole at any time.

New York recently amended its parole conditions. See 9 N.Y.C.R.R. § 155.15(c), which provides that a parolee "hereby consents to any search of his person, his residence, or any property or premises under his control which the Board of Parole or any of its representatives may see fit to make at any time in their discretion." See also United States ex rel. Randazzo v. Follette, 418 F.2d 1319 (2d Cir. 1969), at 1320 n. 4. Without necessarily approving the New York regulation, it is interesting to note that all such searches must be made by a representative of the New York Board of Parole.

2. "Waiver" or "consent" language may be inappropriate, although it is occasionally relied upon. See Holtzoff, supra, at 7. Although the parolee is required to sign the form, and assent to the conditions contained on it, see note 1, supra, the conditions apply whether he signs the form or not. See, e. g., Welch v. Taylor, 292 F.2d 481, 482 (10th Cir. 1961); Hicks v. Reid, 90 U.S.App.D.C. 109, 194 F.2d 327, 329 (mandatory release), cert. denied, 344 U.S. 840, 73 S.Ct. 51, 97 L. Ed. 653 (1952); United States ex rel. Ostin v. Warden, 296 F.Supp. 1135 (S.D. N.Y.1969). Arguably, the releasee consents by leaving the prison. More practically, the conditions may be viewed as reasonable incidents to parole status, with no fictional consent or waiver required to support them.

would have the support of a body of experts in effect declaring that the dangers of harassment had been properly evaluated, and that on balance, this type of surveillance must take precedence over parolees' privacy.

There are good practical reasons for preferring an antecedent determination that spells out the conditions on which a parolee is set at liberty. Parole is far more apt to be successful when limitations on the parolee's freedom are delineated with some degree of certainty. How does one stay gainfully employed if there remains an ever-present anticipation of virtually unbridled questioning and searches? How does one maintain the semblance of a normal home life under such conditions? The Chief Justice of the United States recently remarked in a related context, "We take on a burden when we put a man behind walls, and that burden is to give him a chance to change." He went on to say that "If we deny him that, we deny him his status as a human being and to deny that is to diminish our humanity and plant the seeds of future anguish for ourselves." Address of Chief Justice Warren Burger at the Association of the Bar of the City of New York, Feb. 17, 1970, reported in the New York Times, Feb. 18, 1970, p. 16. Certainly, these interests are rarely absolutes, particularly in the case of one who owes his liberty to Congressional grace—but they are real interests nonetheless, and we ought not to assume lightly that Congress or its agent the Parole Board meant them to be entirely subordinated to the whims of local police officers.

The underlying rationale for excluding evidence seized after an unreasonable search is to impose "a restraint upon the activities of sovereign authority," Burdeau v. McDowell, 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921). The interests involved when we balance individual liberty against the aim of reducing crime are difficult enough to define, and are perhaps even less receptive to evaluation and definition when applied to parolees.[3] For that reason, as well as those I have already mentioned, I would prefer to have the Parole Board, the agency Congress has charged with striking that balance in the first instance, spell out in precise terms—before release—its determination that searches like the one to which Sperling was subjected were reasonable in terms of both overall goals of parole and the dangers of harassment or worse.

Like my brother LUMBARD, however, I am unwilling at this time to say that the Parole Board's failure to set conditions for searches on parolees requires us to order Sperling released. While I am perhaps less inclined than he to believe that there is any considerable likelihood that sporadic searches by police officers have any great effect on the allocation of parole officers' time between supervision and rehabilitation, I would be reluctant at this time in view of the substantial possibility of disruption of the parole system to rule retroactively that the Parole Board may act only through conditions imposed in advance.

---

3. Recent Supreme Court decisions have underlined the use of a balancing test to determine whether a search is "unreasonable" for fourth amendment purposes. See, e. g., Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (warrantless "frisk" permissible); Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) ("frisk" impermissible). See also See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.

2d 943 (1967); Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (requiring warrants for administrative searches, but imposing a lower standard of probable cause); LaFave, "Street Encounters" and the Constitution: Terry, Gibson, Peters and Beyond, 67 Mich.L.Rev. 39, 55–59 (1968); The Supreme Court, 1967 Term, 82 Harv.L.Rev. 63, 181 (1968).