Mrs. Vella **WRIGHT** and Miss
Saora Meyers

v.

**HOUSTON INDEPENDENT SCHOOL
DISTRICT et al.**

**Civ. A. No. 72-H-1484.**

United States District Court,
S. D. Texas,
Houston Division.

May 5, 1975.

Larry Watts, Houston, Tex., for plaintiffs.

William Key Wilde, Houston, Tex., for defendants.

*Memorandum and Opinion:*

SINGLETON, District Judge.

The above-styled-and-numbered cause concerns two former school teachers in the Houston Independent School District who were not recommended for reemployment for the fall semester, 1971, school year.

## JURISDICTIONAL QUESTIONS

The defendants have raised two jurisdictional arguments. The case

was brought pursuant to both 42 U.S.C. § 1983 and 28 U.S.C. § 1331, alleging $50,000 each, actual damages, and $100,000 each, punitive damages. The defendant has asserted that since the Fifth Circuit has held that "[a] school district, under Texas law, is of the nature of a municipality," Harkless v. Sweeny Independent School District, 427 F.2d 319, 321 (5th Cir. 1970), and the Supreme Court has held that a municipality is not a person for purposes of 42 U.S.C. § 1983 for either law or equity cases, Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), the court lacks jurisdiction under 1983. The defense ignores two arguments. The suit is not only against the school district but also against the superintendent of schools in his official capacity. He is a person for 1983 purposes, for injunctive relief at the very least. Monroe v. Pape, *supra*; City of Kenosha v. Bruno, *supra*; Griffin v. County School Board of Prince Edward County, 377 U. S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); Harkless v. Sweeny, *supra*; Edelman v. Jordan, 415 U.S. 651, 94 S. Ct. 1347, 39 L.Ed.2d 662 (1974). In the second place, there has never been a Fifth Circuit or Supreme Court case holding that a suit would not lie against a municipality, and by implication a school district, under 28 U.S.C. § 1331. The concurring opinions of Justices Brennan and Marshall in City of Kenosha v. Bruno, *supra*, clearly states that if $10,000 or more is in controversy then § 1331 jurisdiction is available. At least for purposes of determining the jurisdictional question the court has determined that there is sufficient amount in controversy. Whether or not that amount can be recovered is another question.

The second jurisdictional argument is one which arises from the case of Edelman v. Jordan, *supra*. In that case, the Supreme Court determined that in situations in which officers of a state government are sued for damages in their official capacities for actions they have taken in those capacities the damages invariably come from the state treasuries, not from the pockets of the officials. Because the state ultimately pays any money award assessed in such cases, such suits violate the eleventh amendment to the United States Constitution. The defendants in this case assert that the court lacks jurisdiction to grant a back-pay award to the plaintiffs should they win on the merits because the school district is to be construed as the "state" for purposes of the eleventh amendment. There is really no serious question that prospective injunctive relief could be granted in this case. Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), Edelman v. Jordan, *supra*.

The eleventh amendment, unchanged since its ratification in 1798, reads:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

Although the amendment speaks only in terms of the state, it has long been held that the amendment applies to situations in which the "action is in essence one for the recovery of money from the state," no matter which official or what arm of the state is the nominal party. Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 65 S.Ct. 347, 89 L. Ed. 389 (1945); Edelman v. Jordan, *supra*. *Edelman* concerned the State Welfare Department, the Illinois Department of Public Aids and its director.

The instant suit concerns the school district of Houston, Texas, and the question becomes whether or not the school system in Texas is such that the school districts in the state constitute agencies of the state which can successfully invoke the eleventh amendment against suits for monetary awards.

Characterizing a school district as "state" or "nonstate" for eleventh amendment purposes is not an easy task. *Edelman* did not address itself to the issue of what is or is not the "state." The court has been directed to the language of Fleming v. Upper Dublin Public School District, 141 F.Supp. 813 (E. D.Pa.1956), for the proper method of determining the limits of a state for eleventh amendment purposes:

> [T]he answer to that [federal] question, as to whether a particular state agency is entitled to immunity from federal jurisdiction, must depend upon the characteristics, capacities, powers and immunities of such agency *as they are defined by the law of the State.*

### I. *Immunities*

■ The immunity of the school board from suit, as defined by Texas law, is an area of some confusion. The cases are not very helpful on the question of eleventh amendment immunity. It must be remembered that governmental immunity invoked by a state and its agencies is not identical to eleventh amendment immunity found in the United States Constitution.

■■ There are Fifth Circuit cases which, applying Texas law, hold a Texas school district is in the nature of a municipality. Harkless v. Sweeny, *supra*; Campbell v. Masur, 486 F.2d 554 (5th Cir. 1973). Traditionally, municipalities have been held unprotected by eleventh amendment immunity because they are political corporations politically distinct from the state. Lincoln County v. Luning, 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1889). Yet, Texas cases have held that the school district is merely an agency or arm of the state and is suable only in situations in which the state has waived its governmental immunity as, for example, in the cases specifically provided for in the Texas Tort Claims Act, injuries caused by a motor-driven vehicle. Vernon's Tex.Rev.Civ.Stat.Ann. art. 6252–19 (1969). The seeming contradiction is only the result of the difference in concepts of the immunity based on governmental immunity and the immunity based upon the eleventh amendment. There is a similar difference between the concept of "state" for fourteenth amendment purposes and "state" for eleventh amendment purposes. *Cf.* Edelman v. Jordan, 415 U.S. at 667, 94 S.Ct. at 1358, 39 L.Ed.2d at 675, n. 12.

The Texas cases which clearly establish the immunity of the school district rely solely upon concepts of governmental immunity, derived from theories of sovereign immunity and public policy. Braun v. Trustees of Victoria Independent School District, 114 S.W.2d 947 (Tex.Civ.App.—San Antonio 1938); Calhoun v. Pasadena Independent School District, 496 S.W.2d 131 (Tex.Civ.App. —Houston [14th Dist.] 1973); Coleman v. Beaumont Independent School District, 496 S.W.2d 245 (Tex.Civ.App.— Beaumont 1973). According to the *Coleman* case, governmental immunity for school districts is judge-made law introduced in Texas in 1846 by Hosner v. De Young, 1 Tex. 764 (1846) and approved by the Supreme Court of Texas as late as 1972 in City of Houston v. George, 479 S.W.2d 257 (Tex.1972).

In the *Braun* case, which held that governmental immunity was available to a school board, in the face of an argument that the tort was the result of the board's proprietary, not governmental, activities, the court held that there was "no question but that an independent school district is an agency of the state, and, while exercising governmental functions, is not answerable for its negligence in a suit sounding in tort." 114 S.W.2d at 949. Clearly, however, the court is using "agency" in a general sense.

■ Surprisingly, the *Braun* court goes on to hold that the independent school district is not comparable to a city or a town. "There is quite a distinction between a school district and a city or town." 114 S.W.2d 950. Rather,

the court holds, the school district is akin to a county. There is a reason for the comparison to a county; a municipality has been held under Texas law capable of performing both governmental functions, which were immune from suit and proprietary functions which were not immune from suit. A county, however, is not capable of performing proprietary functions. Since the case turned on the question of proprietary versus governmental function, the *Braun* court cast the school board in with the counties.

## II. *Characteristics, Capacities, Powers*

A more fruitful approach to state law on the status of the school district vis a vis the eleventh amendment is a study of the school district's characteristics, capacities, and powers. It is interesting to review the cases cited by the Fifth Circuit in Harkless v. Sweeny, 427 F.2d 319 at 321, for its determination that under Texas law a school district is in the nature of a municipality. In both Love v. City of Dallas, 120 Tex. 351, 40 S.W.2d 20 (1931), and Lewis v. Independent School District of City of Austin, 139 Tex. 83, 161 S.W.2d 450 (1942), the school district was characterized as a political corporation or subdivision of the State of Texas, similar to municipal corporations. Although, subject to the plenary power of the legislature, these powers are limited. The Supreme Court of Texas said in Love v. City of Dallas:

> We think the Supreme Court of Arkansas, in the case of Pearson v. State, 56 Ark. 148, 19 S.W. 499, 35 Am.St.Rep. 91, correctly stated the rule as to legislative power over school districts, and over school district properties or other municipal properties. The court in part said: "The statement that counties and school districts are agencies of the state, and therefore subject to legislative control or annihilation, is a misleading generality. The corporate entity is a legislative creation, and its powers may be restrained, its functions changed, or its existence destroyed at the will

of the legislature; but, in so far as it has acquired and holds property, it is but a trustee for the local public; and, although its power be withdrawn or its existence ended, the property which survives it belongs to the same public, and must be, in some way, applied to its use. It has no contract right to exist as a corporation, but the public that it represents has a vested right in the municipal property acquired for its benefit, and is entitled to demand that such property be applied to its uses. . . .

40 S.W.2d at 27.

■ Generally speaking, there are two methods by which courts in other states have determined whether or not school districts are the "state" for eleventh amendment purposes. The first is the degree of control exercised over the school district by the state, which would serve to establish how much the school district is a mere agency or alter ego, and second and most important for the *Edelman* case, it would seem, whether or not the money judgment would come from the state treasury.

### A. *Degree of Control*

■ The Texas State Constitution, Art. VII, Sec. 1, Vernon's Ann.St., requires the state legislature to provide for the support and maintenance of a system of public schools. The Central Education Agency has general control of public education at the state level and is composed of the State Board of Education, the State Board for Vocational Education, the State Commissioner of Education and the State Department of Education. Functions not performed by the Central Education Agency are performed by the local school districts. Tex.Ed.Code § 11.01, V.T.C.A. The local school districts are bound by the rules and regulations promulgated by the State Board of Education and the Commissioner of Education which have the force and effect of state laws. Bear v. Donna Independent School District, 85 S.W.2d 797 (Tex.Civ.App.—San Antonio

1935, writ dism'd). The decisions of the local school boards are subject to administrative review by the Commissioner of Education and the State Board of Education. Tex.Ed.Code § 11.13. In cases involving questions of fact only after administrative channels have been exhausted can a suit at law be filed. Wilson v. Abilene Independent School District, 190 S.W.2d 406 (Tex.Civ.App.—Eastland 1945, writ dism'd w. o. m.). When a suit is filed at law, appealing the decision of the State Board of Education, the substantial evidence rule is used. Temple Independent School District v. State Board of Education, 493 S.W.2d 543 (Tex.Civ.App.—Austin 1973, no writ); Lorena Independent School District v. Rosenthal Common School District, 421 S.W.2d 491 (Tex.Civ.App.—Waco 1967, writ ref'd n. r. e.).

 The independent school district in Texas seems to be a hybrid entity, part agency of the state government and part autonomous, political and geographical subdivision. Clearly, the districts are entities which serve the state to carry out the constitutional mandate to provide a public school system. Clearly, too, the state Central Education Agency exercises a certain amount of supervisory control over school district actions, but the fact remains that the Texas Education Code provides for a considerable amount of power vesting in the school district. Section 23.26 provides that the school district is a public corporation; sections 23.26 and 23.28 give the school districts power to make contracts; section 23.27 gives the power to levy and collect taxes and market bonds.

#### B. *Source of Funds*

 In *Edelman* the entire award would have come from the state treasury; in the instant case this is not necessarily so. As the defendant points out

in his brief, the school systems of the state of Texas are partially funded under the Foundation School Program, Tex.Ed.Code, ch. 16. Eighty percent of the financing under this program comes from the state treasury. The remaining 20 percent is raised by the local districts through ad valorem taxes. The costs of operating a school district are greater than the amount provided by the Foundation School Program and, as a result, the local districts must raise additional funds through ad valorem taxes. Approximately 50 percent of the total cost of operating the state's schools is therefore borne by the state. To be specific, in 1972–73—the latest figures provided to the court by the defendants—43.36 percent of the Houston Independent School District's funding came from the state under the Minimum Foundation Program, 2.30 percent came from federal funds, 51.79 percent came from ad valorem taxes, and 2.55 percent came from other local sources. All of the funds, except the federal grants are commingled in the district's depository upon their receipt by the school district. As the plaintiffs have pointed out, the judgment would not necessarily be derived from the state treasury. Furthermore, receipt of funds from the state vests the title to the funds in the school district's trustees who hold it in trust for the district. Such funds cannot be taken away by the state. Love v. City of Dallas, *supra*. The school district possesses an independent fund of money entirely separate from the state's treasury plus the taxing power to increase that fund.

The defendants urge that an award of back pay would thoroughly disrupt the budgetary planning of the school board because the board has no statutory authority to borrow money to make payment for these purposes by virtue of the Special Act Creating Houston Independent School District, Local and Special Laws, 38th Leg., ch. 91 (1923) and Tex. Ed.Code § 20.48, both of which prohibit

the district from engaging in any kind of deficit financing.[1]

Part of the funding for the district comes from ad valorem taxes which could be raised in order to cover an award from this court. There would not seem to be a question of borrowing money in order to pay this award, except for two Texas Supreme Court cases which seem to forbid damage awards from ad valorem tax fund. In City State Bank in Wellington v. Wellington Independent School District, 142 Tex. 344, 178 S.W. 2d 114 (1944), the Supreme Court of Texas faced a situation in which the bank had paid the current salary checks of teachers although the school district had insufficient funds. The insufficiency of funds was the result of the bank's having paid from current funds the salary checks for teachers of the previous year. It was held that the bank could not "recover from the district's delinquent maintenance taxes on the checks issued against its available school fund, *under the allegations and admitted facts of this case*," because to do so would circumvent the law. [Emphasis added.] 178 S.W.2d at 115. The law at that time was art. 2749, R.S.1925, and art. 2827, *ibid*. These statutes were codified, apparently unchanged, into the Texas Education Code of 1971 as sections 22.08 and 20.48, respectively. Section 22.08 provides that "trustees, in making contracts with teachers, shall not create a deficiency debt against the district." Section 20.48(b) (formerly sec. 1 of art. 2827) provides that the state and county available funds are to be used exclusively to pay the salaries of teachers and superintendents, census fees, and interest on short-time loans to pay teachers' and superintendents' salaries. The statute specifically directs that "no loans for the purpose of payment of teachers shall be paid out of funds other than those for the then current year." The Supreme Court interpreted the language to mean: "That is, no valid debt can be created against the available fund to pay teachers unless the claim can be paid out of available funds coming in for that year." In the *Wellington Independent School District* case, the checks for the year 1940–41 were paid out of the available funds for 1941–42, creating a deficit when checks for 1941–42 were paid.

The bank argued that it could look not only to the state and county available funds, but also to the local maintenance taxes pursuant to art. 2827–2 (now 20.-48(c)): "local school funds from district taxes * * * may be used for the purposes enumerated for state and county funds * * * and for other purposes necessary in the conduct of the public schools to be determined by the board of trustees." The Texas Supreme Court rejected this argument for two reasons. In the first place, the statute provides that the local funds are to be used "for the purposes enumerated for state and county funds." Since these cannot be used to pay salaries for the past year, the local funds could not be so used. In the second place, the legislature used the language "may be used" for the purposes enumerated for the state and county available funds, vesting discretion in the district's trustees to decide whether and when the funds were to be used. The courts, the Texas Supreme Court held, could not interfere with the trustees' discretion unless that discretion was used arbitrarily. Since the trustees elected not to resort to the maintenance tax in drawing the checks sued on but drew them against the state and county available funds, the Supreme Court could not say the choice was arbi-

---

1. Since the state scholastic year begins on the first day of September and ends on the thirty-first day of August and the state funds are disbursed to the local districts beginning near the last of September and continuing regularly throughout the year, but the ad valorem taxes are not collected until October, the District must engage in short term financing in order to cover operations from September through December. Sometime in January the District begins to operate on current revenues. This is the only kind of borrowing the school districts are allowed to do.

trary since the fund was ample to take care of the checks properly chargeable to it. In summary the court recited the public policy underlying the statutes in keeping the public schools out of debt for the current operational costs. The bank, having full knowledge of all the facts, violated its bond to faithfully "disburse the school funds according to law," and was not entitled to the judgment.

The Supreme Court of Texas cited the *Wellington* case in Campbell v. Jones, 153 Tex. 101, 264 S.W.2d 425 (1954), in which the board dispensed with the services of a teacher because the trustees were under the erroneous belief that she had not met the preconditions of her contract of employment. Although she won the case, the teacher could not recover her judgment because the trustees were acting in good faith with an honest belief and because "the funds for the school year 1949–1950 had been exhausted for operating the schools for that year and funds appropriated for operating the school on subsequent years could not be used to pay obligations accruing during a previous year." 264 S.W.2d at 426.

Given this interpretation of the Texas Education Code, can the court in the instant case assure the plaintiffs that they will be able to collect a judgment should one be awarded? The two Texas Supreme Court cases can be distinguished from the instant case. In those cases matters of ordinary contract law were at stake. Here we have questions of the violation of federal constitutional rights in the context of a school desegregation case. It must be remembered that in the instant case the Houston Independent School District was operating under a judicially mandated desegregation order. If the district violated that order and if as a result the plaintiffs were damaged, a case very different from the disputes involved in *Wellington* and *Campbell* is presented. Under these circumstances, the court believes the public policy underlying the holdings in those two Texas Supreme Court cases is far outweighed by the federal questions involved. The plaintiffs should not be left with a hollow and meaningless victory. This court believes that it can, should it find for the plaintiffs on the merits, step in and direct the trustees to use their discretionary powers to pay any judgment from the local funds "for other purposes necessary in the conduct of the public schools . . . ."

Finally, the defendants argue that the opinion of the Attorney General of Texas, reviewing the constitutional questions relating to the purchase of liability insurance for school districts, their employees and trustees, determined that the purchase of such insurance by school districts to cover situations in which sovereign immunity would be applicable would violate the Texas Constitution, art. III §§ 51 and 52. To require the school district to pay a judgment in this case would be unjust because it has no insurance to cover this kind of case. The Attorney General's opinion reads in part:

> The trustees of a school district are authorized by the Education Code to purchase insurance to provide indemnity to the district against the costs and expenses of all litigation and against an award of damages where the district is not immune, and such purchase does not violate the Constitution if the same indemnities are extended to the district trustees. The school board may not purchase insurance to indemnify its trustees in situations where it is not itself exposed, actually or potentially to a similar liability.

Attorney General Opinion No. H–70, pp. 305–306. The court fails to see how it establishes the proposition that this is a situation in which sovereign immunity is applicable. It may be unfortunate that the district, relying on its belief that under state law it has no liability, failed to purchase any insurance to cover a case of this kind, but it should not color the court's opinion on whether or

not the district is legally responsible under federal laws.

In the last analysis, the Edelman v. Jordan question should be determined on the basis of whether or not the state treasury will be diminished by the award. Although in some states this might be the case, in Texas the structure of the school system is such that the school district itself has the capacity to raise and spend its own revenues. Section 20.48 of the Texas Education Code, as we have seen, clearly provides at subsection (c):

> Local school funds from district taxes, tuition fees of pupils not entitled to free tuition and·other local sources may be used for the purposes enumerated for state and county funds and for purchasing appliances and supplies, for the payment of insurance premiums, janitors and other employees, for buying school sites, buying, building and repairing and renting school houses, and for *other purposes necessary in the conduct of the public schools to be determined by the board of trustees* . . . . (Emphasis added.)

Although state funds contribute to the school districts' coffers, the state funds are relatively fixed, depending upon computations to be made pursuant to chapter 16 of the Texas Education Code. It is in the area of local school tax assessment that there is flexibility, and it is from this source that an increase in the revenue to pay any money judgment would be derived. Furthermore, those funds are, as we have seen, vested in the school district upon receipt; they are no longer a part of the state treasury. Any money judgment against the school district in the instant case would not be a claim on the state treasury, but only on that fund which is held by the Houston Independent School District.

There is a further argument for why Edelman v. Jordan, *supra,* is not applica· ble to the instant suit. *Edelman* concerned the practices of the Illinois State Welfare Agency which processed applications for state welfare assistance on a time schedule slower than that found by the district court to be consistent with the applicable federal regulations. In addition to enjoining the state authorities to comply in future with the federal regulations, the court had ordered the state agency to remit to the aid recipients benefits which had been wrongfully withheld as a result of the state's failure to comply with the federal regulations.

The Supreme Court held that the district court's order had gone too far because:

> It requires payment of state funds, not as a necessary consequence of compliance in the future with a substantive federal question determination, *but as a form of compensation to those whose applications were processed on the slower time schedule at a time when petitioners were under no court-imposed obligation to conform to a different standard.* (Emphasis added.)

Edelman v. Jordan, 415 U.S. at 668, 94 S.Ct. at 1358, 39 L.Ed.2d at 675.

The Supreme Court seems to be implying here that the situation is different if the state agency violates a judicially mandated standard of action. In *Edelman* the state agency failed to live up to the standards of a federal regulation, but invalidity of its actions had not yet been determined by a court of law. In the instant case, the Houston Independent School District has been ordered by the district court to conduct itself in a specified manner. It has not done so and this may have given rise to a violation of the rights of the plaintiffs herein with accompanying monetary damages. This difference in the circumstances may well make the case not subject to the *Edelman* decision.

For these reasons the court has determined that the eleventh amendment does not bar a money judgment for the plaintiffs.

## MERITS

Plaintiff Saora Meyers applied for a teaching position with the Houston Independent School System on June 3, 1941, but received her first permanent position as an emergency substitute sometime in 1945. In 1957 she was given a probationary contract and assigned to Booker T. Washington High School. In 1960 she received her permanent contract. She stayed at Booker T. Washington nine years. For the 1965–66 school year she was moved to Woodson Junior High School. While at Woodson, Miss Meyers went from contract status to probationary status because of a disagreement with the principal. In the 1967–70 school years she taught at M. C. Williams Junior-Senior High School. In 1969 she was returned to contract status, and in 1970 she received a continuing contract. For the 1970–71 school year she was "crossed over" to Jackson Junior High School in the Houston Independent School District's program to completely integrate the teaching staff.

Up until the time she was "crossed over" to Jackson Junior High School in the fall of 1970, Miss Meyers had taught at all Black or predominately Black schools. Although a study of her evaluations by her principals indicates that she had never been an outstanding teacher, there is very little in her record up until the 1970–71 school year to indicate she was not an average, competent teacher.

Six to eight weeks after she began teaching at Jackson she was called into the principal's office and read a list of charges. The court assumes they are the same as those sent to the Personnel Director of the Houston Independent School District, Mr. Jones, in a letter of September 23, 1970. Later she and the principal met personally with Mr. Jones.

On October 7, 1970, the principal informed David S. McLune, Administrative Assistant, Personnel, that the situation was "an extreme emergency" and requested that she be moved from his school.

On October 12, 1970, Mr. Jones wrote Miss Meyers informing her that she would be relieved of her duties and would not be recommended for rehire for the 1970–71 school year "because of your poor record as a teacher."

She was placed on the substitute list and taught through the 1970–71 year in this capacity. She was replaced at Jackson Junior High School by a white teacher who had previously taught there.

Miss Meyers was not rehired as a teacher in the Houston Independent School District.

Mrs. Vella Wright, the other plaintiff, received her degree in elementary education from Texas Southern University in 1958. She taught in the Northeast Houston Independent School District for three and one-half years, and then she ran her own day care center. In 1963 she returned to public school teaching on an emergency substitute basis for the Houston Independent School District. She taught in that status until 1968 when she received a permanent position on a probationary contract, teaching at Rhodes Elementary. She taught at Rhodes for two years when she left for the "cross-over." Her principal at Rhodes Elementary gave her "fair" and even "poor" ratings in some categories of the "Special Report on Probationary Teachers," but noted that she was improving on each report. The records reveal that these lower-than-"average" ratings kept her from receiving a permanent contract.

According to the records, she was transferred on August 24, 1970, from a fifth grade class at Rhodes Elementary, predominately Black, to supernumerary status at Blackshear Elementary, predominately Black. One month later she was given a fifth grade class at Blackshear. On January 25, 1971, she was "crossed over" to Condit Elementary, a predominately white school. On April 6, 1971, she was removed from her fifth grade class and put on substitute status for the remainder of the semester.

On May 31, 1971, she was informed by Duane Maurstad, her area superintendent, of the reasons why she would not be recommended for rehiring. The reasons were based on the evaluation of the school principal and the acting assistant superintendent. Mrs. Wright's record is replete with conferences held with the Condit principal concerning her teaching techniques and inability to maintain discipline. After she had been at the school some eight weeks, the principal, on April 1, 1971, requested that she be removed from teaching at the school. She, too, was replaced by a white teacher.

As these women were teaching in the school system, the Houston Independent School District was making efforts to desegregate the dual school system and transform the system into a unitary one. The case of Dolores Ross v. Eckels, Civil Action No. 10444, challenging the dual system had been pending in the court of Chief Judge Ben Connally since 1956.

On July 23, 1969, Judge Connally had made known his skepticism of the feasibility of the Houston Independent School District's then current "freedom of choice" plan for desegregation and called for the submission to him of alternative plans. Important to this case was his call for some 2500 "cross-over" teachers by September 1, 1969. In the school board meeting of February 23, 1970, it was noted that this had not been accomplished.

On December 1, 1969, the Fifth Circuit handed down its decision in Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 (5th Cir. 1969), cert. denied, 396 U.S. 1032, 90 S. Ct. 612, 24 L.Ed.2d 530 (1970). This far-reaching case set a deadline of February 1, 1970, for full desegregation in the five areas of students, faculty and staff, transportation, extracurricular activities, and facilities.

Important to the instant case is the fact that with regard to faculty and staff the *Singleton* opinion clearly states at 1218:

3. If there is to be a reduction in the number of principals, teachers, teacher-aides, or other professional staff employed by the school district which will result in a dismissal or demotion of any such staff members, the staff member to be dismissed or demoted must be selected on the basis of objective and reasonable non-discriminatory standards from among all the staff of the school district.

\* \* \* \* \* \*

Prior to such a reduction, the school board will develop or require the development of nonracial objective criteria to be used in selecting the staff member who is to be dismissed or demoted. These criteria shall be available for public inspection and shall be retained by the school district. The school district also shall record and preserve the evaluation of staff members under the criteria. Such evaluation shall be made available upon request to the dismissed or demoted employee.

"Demotion" as used above includes any reassignment (1) under which the staff member receives less pay or has less responsibility than under the assignment he held previously, (2) which requires a lesser degree of skill than did the assignment he held previously, or (3) under which the staff member is asked to teach a subject or grade other than one for which he is certified or for which he has had substantial experience . . . .

The first discussion of beginning a plan of the racial mixing of staff and faculty came up at the February 5, 1970, meeting of the board. The discussion was centered around the cross-over plan suggested by Judge Connally. On February 9, 1970, the board's attorney read to the board a passage from *Singleton* ordering the immediate desegregation of faculty and staff. 419 F.2d at 1217–1218. The reading caused so much confusion that the board meeting was closed to the public. At the February 23, 1970, meeting of the board, various ramifica-

tions of cross-over were discussed, and at the May 25, 1970, meeting, the plan for crossing over teachers and faculty was presented to the board.

On June 30, 1970, Judge Connally's desegregation order came down. In the order he adopted a desegregation plan and ordered desegregation of faculty and staff in language virtually identical to that of the *Singleton* decision.

On August 25, 1970, the Fifth Circuit's decision reviewing Judge Connally's order came down. Although the order was modified by the Fifth Circuit, the faculty and staff provisions derived from *Singleton* were left untouched.

During the same summer of 1970 the cross-over plan was being instituted and the faculty began teaching on the cross-over basis in August of 1970.

The court has gone into some detail in setting out this chronology of events in order to show that at all relevant times the Houston Independent School District was thinking in terms of a "cross-over" teacher plan to be used in desegregating the faculty of the Houston Independent School District, which Judge Connally had called for in July, 1969. Even after the *Singleton* decision came down, ordering a slightly different approach, the Houston Independent School District pursued the cross-over plan. Juge Connally's decision was virtually identical to *Singleton*, but the Houston Independent School District continued to act unaware of the necessity of enacting objective nonracial criteria because when the cross-over plan went into effect in the fall of 1970, there were no teachers dismissed or demoted as a result of the immediate integration of the faculty.

The Houston Independent School District's contention is that the *Singleton* call for nonracial criteria for demotion or dismissal of faculty and staff was made necessary in most dual school situations because in combining schools so that there would be a racial mix there would be too many faculty to fill the number of positions. For example, in Bassett v. Atlanta Independent School District, 485 F.2d 1268 (5th Cir. 1973), in creating a unitary school system the school board combined high schools and junior high schools. There had been five principals serving six schools, but after unification there were positions for only two principals. *Singleton* was in part designed to effectuate a just and nonracial choice of which two of the five principals would be chosen to fill the vacancies. The Houston Independent School District argues that in Houston there were no such situations. No schools were combined; no schools were closed. Various teachers of one race were merely crossed over into schools where the teaching population was of another race so that there would be approximately 35 percent black teachers and 65 percent white teachers in each school. The Houston Independent School District takes the position that once these percentages were reached, the faculty had been desegregated and the school district had complied in spirit with the *Singleton* decree. Compliance with the letter of the *Singleton* law was unnecessary in view of the circumstances.

Judge Connally must have been aware of the cross-over plan which the Houston Independent School District was in the midst of implementing in the summer of 1970. Yet, he chose to adopt the language of *Singleton* when ordering the desegregation of the faculty of the Houston Independent School District. Cross-over would certainly have been a way to effect the desegregation and could have coexisted with the *Singleton* requirements; the requirement of nonracial criteria must have had some application apart from a situation such as existed in the *Bassett* case. Certainly, in the instant case such criteria would have been useful and would have solved all of the problems which this case presents.

In Thompson v. Madison County Board of Education, 476 F.2d 676, rev'd on remand, 496 F.2d 682 (5th Cir.

1974), the Fifth Circuit faced a problem similar to that in this case. In that case the Board of Education had refused to rehire two black teachers allegedly for reasons of racial discrimination. There was no dispute that the criteria established by the *Singleton* decision had not been implemented. The Fifth Circuit had remanded for a determination of whether or not at the time the teachers were dismissed the board was in the process of carrying out the *Singleton* decision. 476 F.2d 676 (5th Cir. 1974). In the appeal of the decision on remand, the Fifth Circuit again set out in detail its interpretation of the *Singleton* language. In Madison County, as in Houston, there was no need to reduce teachers. The teachers who were not rehired for the following year had been refused continued employment for specific reasons which the school board had contended occurred after desegregation and unrelated to the reduction in the number of teachers. The Fifth Circuit was not concerned with the context of the firings, but was concerned with the status of desegregation. The court concluded that desegregation had not been completed at the time the plaintiffs were refused rehiring because, as it had found in McLaurin v. Columbia Municipal Separate School District, 478 F.2d 348, 352 (5th Cir. 1973), *Singleton* is rendered inapplicable only when "full compliance with the desegregation directives of this Court" is achieved.

 Determining whether or not the school system is "within" or "without" the *Singleton* decision is important to the instant case because Thompson v. Madison County Board of Education, *supra*, makes very clear that in cases falling within the *Singleton* mandate courts must utilize unique standards in determining whether or not faculty has been dismissed or demoted.

We recognize that under certain circumstances, *Singleton* notwithstanding, discharges on the basis of "just cause" may be warranted without reference to the school board's pre-established objective and reasonable standards. However, "just cause" in a *Singleton* situation does not refer to a teacher's lack of professional credentials, his poor performance in the classroom, his failure to abide by school regulations, his lack of cooperation, or other similar explanations. These types of reasons for discharge fall directly within the scope of *Singleton,* and accordingly such discharges must be justified on the basis of objective and reasonable standards for dismissal previously set by the school board. If this kind of a discharge can be justified in terms of the established objective standards, it is not for "just cause"; it is simply a discharge in compliance with *Singleton* criteria. "Just cause" in a *Singleton* situation means types of conduct that are repulsive to the minimum standards of decency—such as honesty and integrity—required by virtually all employers of their employees, and especially required of public servants such as school teachers. No pre-established objective criteria are necessary to justify the discharge of a teacher whose conduct does not measure up to these minimum standards of behavior.

Thompson v. Madison County Board of Education, 476 F.2d 676 at 678–679, quoted in Thompson v. Madison County Board of Education, 496 F.2d 682 at 688. In *Thompson* the school system was integrated neither in faculty nor in student body when the teachers were not rehired. In the Houston situation, the schools were probably integrated as to faculty, but were not integrated as to student population.[2] Full compliance

2. The desegregation plan of Judge Connally was modified by the Fifth Circuit. A successful desegregation under the Fifth Circuit's plan would have left fifteen elementary schools all or virtually all Negro. [Judge Connally's plan would have left 27.] An examination of the June 1971 statistics from the biracial committee reveals that the fif-

with *Singleton* had not been achieved, system-wide. The court hestiates, however, to conclude that system-wide full compliance must be achieved before the *Singleton* decision is inapplicable. *Singleton* was divided into five subsections, as was Judge Connally's final order in *Dolores Ross:* students, faculty and staff, transportation, extracurricular activities, and facilities. Full compliance with one subsection would seem to take that area out of *Singleton,* although in other areas there had not been full compliance and although the district court retained jurisdiction over the case in order to supervise the continued adherence to desegregation. At some point, especially in the faculty hiring and firing area, it must be determined that the school district is no longer operating under the dictates of *Singleton* in order to insure that there are no incompetent teachers teaching in the Houston schools, although it remains difficult for this court to understand why objective nonracial criteria would not make the process easier and more just, *Singleton* or no *Singleton.* Yet, the fact remains that the Houston Independent School District School Board integrated the faculty without reference to the nonracial criteria; so we return to the question of whether or not at the time Miss Meyers and Mrs. Wright were not rehired, the board was operating within the scope of *Singleton,* although desegregating faculty without reference to *Singleton.* The court has reached the conclusion that the board was operating within the *Singleton* mandate. To be sure, on August 31, 1970, the day all the Houston schools began to operate on a 35:65 ratio of black to white teachers,

the faculty of the Houston Independent School District was desegregated. However, the board was still in the process of desegregating the faculty if only because the board was not and could not be sure of how the plan was working.

At least as late as December 13, 1971, the board was discussing the possibility of completely changing the faculty desegregation plan of the school system. Although this plan did not go into effect, the discussion of the plan does indicate that the board felt it was still in the process of desegregating. Without more evidence, this court cannot determine when the *Singleton* decision became inapplicable to the Houston system, at least with regard to the faculty, but it has determined that as of the time that Mrs. Wright and Miss Meyers were demoted and subsequently not rehired, the board was operating within the *Singleton* mandate.

■ Although the defendants adamantly contend that the plaintiffs were incompetent teachers, it is clear to this court that no objective nonracial criteria were used to decide not to rehire these two women. The court cannot say, in view of this fact and of the fact that the decision not to rehire them came within months of their "cross-over" into white schools, that racial prejudice may not have entered into that decision at some point. Accordingly, the court determines that Miss Meyers and Mrs. Wright should be reinstated as teachers in the Houston Independent School System in the same status as they were before October 12, 1970, for Miss Meyers and April 6, 1971, for Mrs. Wright.

teen schools which the Fifth Circuit "allowed" to be all Black or virtually all Black were indeed all Black. Of the fifteen, the school with the highest percentage of white students, Dogan, had 9.26 percent whites. Figuring for the other elementary schools, however, from the figures of the Biracial Council for 1970, the court found that 17

additional "non-allowed" schools had less than 9.26 percent white students and two more schools had less than 10 percent whites. It is obvious that the Houston Independent School District was not integrated as far as students are concerned in 1970, when the plaintiffs were discharged.