**UNITED STATES of America ex rel. W. O. COLEMAN, Petitioner,**

v.

**Harold SMITH, Superintendent, Attica Correctional Facility, Respondent.**

**No. Civ–1972–588.**

United States District Court, W. D. New York.

June 17, 1975.

Daniel J. Weinstein, Legal Aid Bureau of Buffalo, Inc., Prisoners' Legal Assistance Project, Buffalo, N. Y., for petitioner.

Louis J. Lefkowitz, Atty. Gen. of N. Y. (Douglas S. Cream, Buffalo, N. Y., of counsel), for respondent.

CURTIN, Chief Judge.

This is a habeas corpus proceeding brought pursuant to 28 U.S.C. § 2254, to

collaterally attack the constitutionality of the petitioner's New York State conviction for felony possession of drugs. The substances were seized during the course of a warrantless "routine search" of the petitioner's bedroom, conducted in his absence, by his parole officer. The drugs were introduced in evidence in a new criminal proceeding and resulted in a sentence extending beyond the expiration date of the petitioner's original term.

The petitioner contends that the County Court Judge erred when he ruled from the bench, following a pretrial suppression hearing, that the evidence seized was admissible. The judge found that the warrantless search was lawful because it was conducted pursuant to a consent executed by the petitioner. (Suppression Hearing Tr. at 36.) Petitioner challenged this finding on appeal and is properly before this court, having exhausted available state remedies. 28 U.S.C. § 2254(b).

On March 25, 1969 when the search was conducted, petitioner was on parole from what was then Attica State Prison. Prior to his release on October 24, 1968, petitioner executed an "agreement" which provided that he conform with the conditions listed as consideration for his release on parole, under penalty of revocation. (See Exhibit I annexed to respondent's answering affidavit filed February 10, 1974.) Paragraph 3 of the "agreement" contains the following language:

. . . I hereby consent to any search of my person, my residence or of any property or premises under my control which the Board of Parole or any of its representatives may see fit to make at any time in their discretion. (Exhibit I, *supra*.)

This provision and all the others contained in the agreement were boiler plate derived from regulations promulgated by the New York State Board of Parole, 9 N.Y.C.R.R. § 155.15 (1965), pursuant to statutory authority under the New York Corrections Law.[1]

The factual circumstances surrounding the signing of the consent were not developed at the suppression hearing. The only testimony was that of Michael Falk, the petitioner's parole officer. He did not witness the signing, but he stated that the petitioner had to sign in order to be released. Falk's contention is borne out by the controlling parole release regulation [9 N.Y.C.R.R. § 155.10 (1965), presently 7 N.Y.C.R.R. § 1915.-5(c)(1974)], and was conceded by counsel for the respondent during oral argument in this court. In spite of this, it is argued that the executed agreement can sustain a search occurring five months later. I disagree.

Initially, I note that New York State's practice of conditioning parole release upon execution of a consent to indiscriminate search stands in sharp contrast to that of forty-seven states in the Union. Wolin, R., *After Release—The Parolee in Society*, 48 St. John's L.Rev. 1, 11 (1973). The federal policy is aligned with the vast majority of states as well. The basis for invalidating the search is not grounded in these figures, however, but in the Bill of Rights.

An established concept in our jurisprudence is that "except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Camara v. Municipal Court*, 387 U.S. 523, 528–29, 87 S.Ct. 1727, 1731, 18 L. Ed.2d 930 (1967); *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S. Ct. 2022, 29 L.Ed.2d 564 (1971).

■■ To substantiate a "proper consent" to search, the State must prove

---

1. The present incarnation of the standard agreement appears in 7 N.Y.C.R.R. 1915.10 (1974), which reads in pertinent part:

(4)(c) I understand that I am legally in the custody of the Department and that my person, residence, or any property under my control may be searched by my parole officer or any other representative of the Board.

"that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S. Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). Furthermore, voluntariness must be proven by a preponderance of the evidence. *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *United States v. Boston,* 508 F.2d 1171, 1178 (2d Cir. 1974); *United States v. Fernandez,* 456 F.2d 638, 640 (2d Cir. 1972). In determining whether the burden has been met, a court must examine the totality of facts and circumstances surrounding the giving of consent. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Mapp,* 476 F. 2d 67, 78 (2d Cir. 1973).

> . . . [T]he Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting "consent" would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed.

*Schneckloth, supra* at 228, 93 S.Ct. at 2048.

There is no real factual dispute presented to this court with regard to the petitioner's consent executed in October of 1968. He was received at Attica in February of 1962 and was in continuous custody there for six and a half years. No responsible account of the conditions extant would deny the lack of minimal privacy available to an inmate, or dispute the harshness and even dangerousness of the daily regimen.[2]

*Schneckloth, supra* at 247, 93 S.Ct. 2041, recognized custody as an important factor for courts to weigh in determining coercive circumstances. But the Supreme Court also cautioned that consideration of the "possibly vulnerable subjective state of the person who consents" is critical. 412 U.S. at 229, 93 S.Ct. at 2049. *See also United States v. Faruolo,* 506 F.2d 490 (2d Cir. 1974).

■ When Coleman was given the "agreement" to sign, parole had been granted. However parole is characterized, "the liberty is valuable" and a return to a lifestyle approximating normalcy is cherished. *Morrissey v. Brewer* 408 U.S. 471, 482, 92 S.Ct. 2593, 33 L. Ed.2d 484 (1972). *See also United States ex rel. Johnson v. New York State Board of Parole,* 500 F.2d 925 (2d Cir. 1974). Only Coleman's signature on the dotted line could secure the benefit of parole. A refusal to sign slammed the cell door shut until January 1977, more than eight years. (*See* Exhibit I, *supra.*) Under these circumstances, I find sufficient coercion present to invalidate the consent to search executed.

Finding the consent tainted does not terminate the court's inquiry, however. If, as the State contends, Parole Officer Falk had independent authority to make the search without Coleman's consent, then the introduction of the evidence would not be constitutional error. Resolving this question requires examination of the circumstances of the search itself.

Prior to his release from Attica in October of 1968, Coleman had arranged to sublet a bedroom at 172 Mulberry Street in Buffalo, New York from his brother-in-law, Willie Adams. Officer Falk inspected the room before Coleman's release and visited him in the home several times during the first few months of parole supervision. Coleman had not been searched on any of these other occasions.

On March 25, 1969 Falk visited the home and was informed by Adams that Coleman was working an evening shift. Falk decided, on the spot, to search Coleman's room. During the course of the search, Falk discovered a closed black suitcase underneath Coleman's bed.

2. *See generally Attica: The Official Report of the New York State Special Commission on Attica* (Bantam Ed. 1972).

Upon opening, the contents appeared to Falk to be heroin, heroin "cutting" paraphernalia and a small quantity of marihuana. Falk confiscated the suitcase and proceeded to confirm the nature of the substances seized and to apprehend Coleman at work. At no time in his pretrial or trial testimony did Falk indicate that he harbored any suspicions prior to conducting the search that Coleman had violated any of the conditions of his parole. The sole foundation for the search was the purported consent and Falk's own conception of his responsibility to conduct searches from time to time to ascertain whether or not the parolee had lapsed into criminal ways. (Suppression Hearing Tr. at 7.)

■ It is this "routine," unfettered discretionary power to search which I find objectionable and conclude that, under the circumstances of this case, admission of the incriminating evidence seized was harmful error.

In this circuit, the case most on point is *United States ex rel. Santos v. New York State Board of Parole*, 441 F.2d 1216 (2d Cir. 1971). In *Santos*, a New York City detective was tipped by a confidential informant that the relator was dealing in stolen property. The detective passed the information on to the relator's parole officer. The parole officer obtained a parole violation warrant, believing that he had "reasonable grounds to conclude that Santos had lapsed into criminal activity." 441 F.2d at 1217. When the parole officer, accompanied by the detective, was admitted to the relator's apartment by his landlady, several items of stolen property were found. The items recovered were introduced in a new criminal proceeding. The introduction of this evidence against Santos was sustained. The court, in *Santos*, found that the parole regime demanded a diminution of fourth amendment rights of parolees. Authority to search was a necessary and desirable tool for investigating the facts and circumstances of actual and suspected violations of parole. *Santos, supra* at 1218.

Upon finding the seizure by the parole officer reasonable, the court approved the introduction of the evidence in a subsequent prosecution. 441 F.2d at 1219.

In the instant proceeding, Coleman's parole officer was likewise engaged in a normal supervisory capacity. Unlike the parole officer in *Santos*, however, Falk possessed neither reasonable suspicions of the petitioner's actual or imminent violation of a condition of parole, nor did he secure a parole violation warrant. The utter lack of any articulated or unarticulated suspicions distinguishes the instant case from *Santos* and from cases in other jurisdictions cited by the parties in their briefs. *See People v. Hernandez*, 229 Cal.App.2d 143, 40 Cal.Rptr. 100 (1964) (unidentified police informer); *People v. Mason*, 5 Cal.3d 759, 97 Cal.Rptr. 302, 488 P.2d 630 (1971) (defendant's car at scene of crime); *State v. Schlosser*, 202 N.W.2d 136 (N.D. 1972) (search following arrest on new charge); *State v. Davis*, 9 Or.App. 412 (1st Dept. 1972), 496 P.2d 923 (informer); *People v. Byrd*, 38 Cal.App.3d 941, 113 Cal.Rptr. 777 (Cal.Ct. of Appeals, 1st Dist. 1974) (information from police agency); *State v. Cullison,* 173 N.W.2d 533 (Iowa 1970), *cert. denied*, 398 U.S. 938, 90 S.Ct. 1831, 26 L.Ed.2d 270 (parolee's suspicious behavior observed by parole officer); *State v. Simms*, 10 Wash.App. 75, 516 P.2d 1088 (2d Div. 1973) (anonymous informant).

Very recently the United States Court of Appeals for the Ninth Circuit published en banc decisions in the cases of *Latta v. Fitzharris*, 521 F.2d 246 (9th Cir. 1975), and *United States of America v. Consuelo-Gonzalez*, 521 F.2d 259 (9th Cir. 1975). In *Latta*, the court clearly decided that parolees are entitled to some fourth amendment protection. Latta's parole officer apparently had reason to believe that Latta was violating the conditions of his parole. At the time of the concededly valid arrest, Latta was holding in his hand a pipe containing marihuana. Shortly thereafter,

Latta's parole officer conducted a search of Latta's home which resulted in the discovery of a much larger quantity of marihuana. This evidence was introduced in a new criminal proceeding and resulted in Latta's conviction. The Ninth Circuit Court of Appeals sustained the introduction of this evidence. The court in *Latta, supra*, rejected both a proposed probable cause standard and a warrant requirement standard for searches of parolees by parole officers. Ten judges found the search under the circumstances presented by this case to be reasonable and embraced a "reasonable parole officer" standard.

In the opinion receiving the broadest support, five judges articulated the following standard:

> . . . [T]he parolee and his home are subject to search by the parole officer when the officer reasonably believes that such search is necessary in the performance of his duties. The parole officer ought to know more about the parolee than anyone else but his family. He is therefore in a better position than anyone else to decide whether a search is necessary. His decision may be based upon specific facts, though they be less than sufficient to sustain a finding of probable cause. It may even be based on a "hunch," arising from what he has learned or observed about the behavior and attitude of the parolee. To grant such powers to the parole officer is not, in our view, unreasonable under the Fourth Amendment. The principal protection against abuse of this authority is the "helping" function of the parole officer's job, and the training that he has received to fit him for that job. A good parole officer does not regard himself as a policeman.

*Latta, supra*, at 250.

Three concurring judges would have extended the relaxed requirements for searches of parolees to law enforcement personnel as well. The two remaining judges concurred in all respects except with regard to the parole officer's "hunches," and would eliminate that language entirely.

All of the opinions stop short of condoning all searches by parole officers under all circumstances. The court did defer to future judgments of the state courts, however, to make future determinations of the types of searches of parolees which may be unreasonable. This shading of "comity" in the *Latta* case comes into sharper contrast in the companion case, *Consuelo-Gonzalez, supra*.

In *Consuelo-Gonzalez, supra*, the petitioner was a federal probationer with an open-ended consent to search as a condition of probation. Her person and home were searched without warrants by federal law enforcement agents acting on a series of tips. The court suppressed this evidence for use in a new criminal proceeding, largely because the search conducted by government agents was not consonant with the purposes of the Federal Probation Act. 18 U.S.C. § 3651. The opinions did point out, however, that if the search had been conducted by Consuelo-Gonzalez's probation officer, the standards of reasonableness articulated in the *Latta* case would have been brought to bear. *Consuelo-Gonzalez, supra* at 266.

Although I harbor reservations about the holdings in the *Latta* and *Consuelo-Gonzalez* cases, it is clear that in the instant case the search is unreasonable even under those standards. It cannot be overemphasized that the parole officer in the instant case pointed to nothing in the way of subjective information to justify the search conducted of petitioner Coleman's bedroom. Furthermore, since Coleman was not even present, nothing in his manner could have triggered the parole officer's suspicions. The search was conducted arbitrarily and the evidence cannot be introduced unless the mere fact of parole status alone acts as a legal foundation for any search. That contention has not held sway in the recent cases in the Ninth Circuit or in this one in the past.

*United States ex rel. Randazzo v. Follette,* 418 F.2d 1319 (2d Cir. 1969), *cert. denied,* 402 U.S. 984, 91 S.Ct. 1672, 29 L.Ed.2d 150 (1971) ; *United States ex rel. Sterling v. Fitzpatrick,* 426 F.2d 1161 (2d Cir. 1970).

The State contends that the "administrative search" exception to the warrant requirements has special application in parole cases, citing *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L. Ed.2d 87 (1972), and *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970). Those cases, however, reinforce the germinal language of *Camara v. Municipal Court, supra* 387 U.S. at 528, 87 S.Ct. 1727, which limited the warrant exception to "carefully defined classes of cases." *See also United States ex rel. Terraciano v. Montanye,* 493 F.2d 682 (2d Cir. 1974), *cert. denied,* 419 U.S. 875, 95 S.Ct. 137, 42 L.Ed.2d 114 (1974). What these cases have in common, and what is lacking in the parole supervision scheme, are statutory or regulatory standards for conducting the warrantless searches. *See Latta v. Fitzharris, supra* at 255– 256 (Hufstedler, J., dissenting). A "regulatory" approach to search and seizure questions is an embryonic legal theory. Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn.L.Rev. 349, 416– 428 (1974). But, in immigration cases, an area of sensitivity paralleling that of parole supervision, the fruits of searches have been suppressed because there were insufficient standards to guide the discretion of the officer in the field. *Almeida-Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) ; *United States v. Barbera,* 514 F.2d 294 (2d Cir., Mar. 24, 1975).

Articulating the precise standards which parole officers should apply in the field is not a question that this court need address at this time. An invitation extended to federal parole authorities in *United States ex rel. Sperling v. Fitzpatrick, supra* (Kaufman, J. concurring) may, however, still be attractive:

The interests involved when we balance individual liberty against the aim of reducing crime are difficult enough to define, and are perhaps even less receptive to evaluation and definition when applied to parolees. For that reason, as well as those I have already mentioned, I would prefer to have the Parole Board, the agency Congress has charged with striking that balance in the first instance, spell out in precise terms—before release—its determination that searches like the one to which Sperling was subjected were reasonable in terms of both overall goals of parole and the dangers of harassment or worse.

*Sperling, supra* at 1168.

In *United States ex rel. Santos v. New York State Board of Parole, supra,* the parole officer, acting on a prior belief of a parole violation, secured a parole violation warrant. When a subsequent search of the parolee's apartment was made, the Second Circuit Court of Appeals sustained the search as reasonable. That standard may supply a departure point for the promulgation of regulations governing the searches of parolees by parole officers, and even law enforcement officials. In the absence of regulations, however, the day may come when the fruits of searches of parolees will be admissible in parole revocation proceedings only. *See* Amsterdam, *supra* at 437. *See also United States v. Skipwith,* 482 F.2d 1272 (5th Cir. 1973) (Aldridge, J. dissenting) at 1280–81.

The State propounds a third theory which would permit the contents of the closed suitcase seized underneath the bed in petitioner Coleman's room to be admitted. It is alleged that Willie Adams, the petitioner's brother-in-law, gave a valid third-party consent to the search. *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) ; *Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). It is not at all clear whether a third-party consent would extend to Coleman's suitcase

under the circumstances of this case. *See United States v. Pravato,* 505 F.2d 703 (2d Cir. 1974).

In any event, the record below is equivocal on this point. Furthermore, the State never presented this theory to validate the search in the state courts at any level. Therefore, they should not be permitted to raise this justification for the first time here. Their remedy is to attempt to justify the search on those grounds, if they choose, in a new trial. *Whiteley v. Warden,* 401 U.S. 560, 91 S. Ct. 1031, 28 L.Ed.2d 306 (1971).

Therefore, it is hereby ordered that a writ of habeas corpus issue to the petitioner, W. O. Coleman, unless the State of New York commences new criminal proceedings against him within sixty days.

So ordered.