Carmen DIAZ et al., Plaintiffs,

v.

Benjamin WARD et al., Defendants.

No. 75 Civ. 1194–CSH.

United States District Court, S. D. New York.

Sept. 26, 1977.

David Rudenstine, Project on Sentencing & Parole, New York Civil Liberties Union, New York City, for plaintiffs; Arthur Eisenberg, Thomas R. Litwack, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, New York City, for defendants; Margery Evans Reifler, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiffs, parolees under the criminal justice system of the State of New York, and members of their families, commenced this action on their behalf and all others similarly situated. The defendants are the Commissioner of Correctional Services of New York; the former Commissioner; the Chairman of the State Board of Parole; the Deputy Commissioner for Parole and Community Services; the Directors of the New York and Bronx Area Parole Offices; a number of New York State parole officers; and the Department of Correctional Services and Board of Parole.

Plaintiffs allege that defendants have administered and implemented New York State parole procedures in such a way as to deprive them of rights, privileges and immunities guaranteed by the United States Constitution. They pray for declaratory relief, and for compensatory and punitive damages. Jurisdiction in this Court is said to arise out of 42 U.S.C. § 1983,[1] and its procedural implementation, 28 U.S.C.

---

1. "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

§ 1343;[2] alternatively plaintiffs allege federal question jurisdiction under 28 U.S.C. § 1331(a).[3]

Plaintiffs pray for class action designation, pursuant to Rule 23, F.R.Civ.P. There are two putative classes: (1) those who are now on parole or conditional release and those who are in prison and are or will become eligible for such release; and (2) those family members of parolees who reside with them.

Defendants oppose the request for class certification, and also move for judgment on the pleadings (save for two isolated claims) under Rule 12(c), F.R.Civ.P.

For the reasons stated *infra,* defendants' motion for judgment on the pleadings is denied, and class certification is granted provisionally.

## I.

*The Allegations of the Complaint*

█ Evaluation of defendants' motion necessarily begins with a consideration of the complaint. Upon a motion for judgment on the pleadings under Rule 12(c), "the well-pleaded material facts must be taken as admitted." *Gumer v. Shearson, Hammill & Co.,* 516 F.2d 283, 286 (2d Cir. 1974). The moving party does not, of course, admit conclusions of law. 5 Wright & Miller, *Federal Practice and Procedure* (1969), § 1368, pp. 692–693.

Turning to the complaint in the case at bar,[4] parolees and members of their families allege a "pattern and practice", indulged in by defendants, of subjecting their persons, residences, papers, effects and property to searches which plaintiffs characterize as "without consent, search warrant or probable cause." In some instances parole officers are alleged to have conducted searches at gun point, threatened the return of parolees to prison, and interfered with parolees' social contacts. It is not necessary to restate here all the allegations of a lengthy complaint comprising 36 pages and 142 separate paragraphs.[5]

2. "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person: . . .
 "(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.
 "(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

3. "(a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States."

4. The original complaint was filed on March 12, 1975. It was amended by stipulation and order on June 20, 1975, so as to delete a prior demand for injunctive relief, delete a request for a three-judge court, restate the jurisdictional allegations, and renumber the paragraphs in the complaint. The discussion in this opinion follows the numbering in the amended complaint.

5. Two examples may be given. Plaintiff Carmen Diaz alleges that her son, plaintiff Angelo Andino, resided with her in the Bronx for eight weeks in 1974 while he was on parole. On at least twelve occasions during that time, parole officers searched the apartment and the plaintiffs' papers, effects and property. On several occasions the parole officer, defendant Douglas Millar, told Mrs. Diaz he intended to return her son to prison. On another occasion he told Andino that he did not wish to see one Martha Otero, a neighbor, in the apartment again. All these searches were unannounced; Millar would arrive at times as early as 7:30 a. m. Complaint, ¶¶ 5–7, 41–51.
 Plaintiff Harold Smith alleges that on January 22, 1974, while he was on parole, and living with his family in a Bronx apartment, three parole officers entered, searched every room, handcuffed Smith, and pointed handguns at Smith, his son Anthony (age 14) and daughter Sheryl (age 12). ¶¶ 12–16, 87–99.
 Plaintiffs characterize these searches as having taken place "without consent, search warrant or probable cause", as do the other plaintiffs. To the extent that this characterization amounts to a legal conclusion, it is not admitted on defendants' Rule 12(c) motion. But the factual allegations must be deemed admitted, including the allegations that the parole officers in question were acting "without consent" and without having obtained a warrant.

## II.

*Plaintiffs' Constitutional Claims*

While plaintiffs invoke a number of Constitutional provisions,[6] the Fourth Amendment lies at the heart of their case. It provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The case at bar poses the significant question of the extent to which parolees are protected, if at all, by the Fourth Amendment's prohibition against unreasonable searches and seizures. That question has arisen before, in the somewhat different context of parolees' efforts to exclude evidence seized during an allegedly unconstitutional search. Insofar as the researches of counsel and the Court reveal, the instant case is the first one seeking a declaration of rights and award of damages under the civil rights statutes and the Constitution.

The briefs of counsel, while extensive, are less than entirely helpful because each party tends to exaggerate the other's stated position, in order that it may be attacked with particular vigor. Thus plaintiffs accuse defendants of asserting the *"unrestrained power* to search plaintiffs' homes" (brief, p. 2, emphasis in original), which overstates defendants' position, at least as articulated by their counsel on the present motion; while defendants describe plaintiffs as claiming that parolees "are entitled to the same Fourth Amendment protections as an ordinary citizen" (reply brief, p. 2), which is not really the case. The resulting clash of legal arguments is reminiscent of Arnold's "Dover Beach".[7]

In this Court's view, ample authority sustains the proposition that parolees and their families enjoy a significant measure of protection under the Fourth Amendment. It is neither necessary nor appropriate, within the context of defendants' motion addressed to the legal sufficiency of the complaint, to determine the precise boundaries of that protection. The dispositive issue on this motion is whether plaintiffs' factual allegations, if established on the trial, would entitle them to some measure of relief. The Rule 12(c) motion fails because I answer that question in the affirmative.

## III.

*Parolees' Rights Under the Fourth Amendment*

Within the context of the admissibility, in a subsequent prosecution, of evidence seized during the search of a parolee, the law is settled in this Circuit that a parolee's Fourth Amendment rights are reduced, but not eliminated. Thus in *United States ex rel. Santos v. New York State Board of Parole,* 441 F.2d 1216 (2d Cir. 1971), a New York City detective "received information *which provided him with reasonable grounds to believe* that appellant, a parolee, was 'dealing' in stolen goods." 441 F.2d at p. 1217 (emphasis added). The detective informed the parole officer, who, on the basis of that advice, formed the belief "that there was *more than reasonable grounds* to conclude that Santos had lapsed into criminal activity." *Id.* (emphasis added). A search of the parolee's apartment yielded several items of stolen property which the parolee unsuccessfully sought to suppress, on the theory that "the Fourth Amendment bestows on parolees rights coextensive with those guaranteed to ordinary citizens." 441 F.2d at pp. 1217–1218. The Second Circuit, affirming a denial of habeas corpus following exhaustion of state remedies, disagreed:

Where ignorant armies clash by night."
I do not mean to characterize able counsel in this case as "ignorant armies".

---

**6.** The complaint alleges violations of the First, Fourth, Fifth, Ninth and Fourteenth Amendments.

**7.** "And we are here as on a darkling plain
Swept with confused alarms of struggle and flight

"Without attempting to define precisely the extent of Fourth Amendment protection against searches and seizures which a parolee might have in the abstract, it is indisputable that the Fourth Amendment affords protection only against unreasonable searches. A search which would be unlawful if directed against an ordinary citizen may be proper if conducted against a parolee. *United States ex rel. Randazzo v. Follette,* 418 F.2d 1319, 1322, n. 7 (2nd Cir. 1969)." 441 F.2d at p. 1218.

*Randazzo,* cited by the Second Circuit in *Santos,* also involved a state parolee's habeas corpus petition after an unsuccessful effort to suppress evidence (heroin). The parole officer received information "from what he testified was a reliable source" that the parolee had consorted with a convicted felon and committed other parole violations; the parolee himself admitted such consorting; a subsequent search of his apartment then revealed the heroin. On these facts, the Second Circuit rejected the parolee's Fourth Amendment argument. The Court stopped short, however, of endorsing the district court's conclusion that a search of a parolee's residence was not in violation of the Fourth Amendment "because done without a warrant, without consent, and without probable cause." 282 F.Supp. 10 at p. 15. Reacting to that statement, the Second Circuit said:

"It is possible that this formulation is too broad. A parolee is said to be entitled to some quantum of Fourth Amendment protection against 'unreasonable searches and seizures.' (citing cases).

"However, a search which would be 'unreasonable' if an ordinary citizen were involved, might be reasonable if directed against a parolee. It would be unrealistic to ignore the fact that parolees, as a class, pose a greater threat of criminal activity than do ordinary citizens." 418 F.2d at p. 1322 n. 7.

Implicit in these decisions is the concept that if the search of a parolee or his residence is unreasonable, his Fourth Amendment rights have been violated and the evidence will be suppressed.[8] That is the holding of *United States ex rel. Coleman v. Smith,* 395 F.Supp. 1155 (N.D.N.Y. 1975), a scholarly opinion by Chief Judge Curtin with which I entirely agree. In *Coleman* a parole officer named Falk, who had visited the parolee at home a number of times, found him absent on one occasion and "decided, on the spot, to search Coleman's room", 395 F.Supp. at p. 1157, thereby discovering drug paraphernalia under the bed. Distinguishing *Santos* and granting habeas corpus, Judge Curtin held:

"Unlike the parole officer in *Santos,* however, Falk possessed neither reasonable suspicions of the petitioner's actual or imminent violation of a condition of parole, nor did he secure a parole violation warrant. The utter lack of any articulated or unarticulated suspicions distinguishes the instant case from *Santos* and from cases in other jurisdictions cited by the parties in their briefs." 395 F.Supp. at p. 1158.

The state court in *Coleman* had denied the suppression motion on the ground that the warrantless search was conducted pursuant to a "consent" executed by the parolee. The purported "consent" appeared in a release agreement which, under New York procedures, any parolee had to sign to obtain his freedom. The paragraph in question read:

" . . . I hereby consent to any search of my person, my residence or of any property or premises under my control which the Board of Parole or any of its representatives may see fit to make at any time in their discretion."

After a careful review of Supreme Court authority, Judge Curtin found "sufficient

---

**8.** In an earlier case, *United States ex rel. Sperling v. Fitzpatrick,* 426 F.2d 1161 (2d Cir. 1970), the Second Circuit held that the exclusionary rule did not apply in a parole revocation proceeding. It is apparent, however, that the Constitutional questions presented by the case at bar were not squarely addressed by the *Sperling* court. See concurring opinions of Lumbard, Ch. J., at 426 F.2d 1165, and Kaufman, Ct. J., at 426 F.2d 1167–1168.

coercion present to invalidate the consent to search executed." 395 F.Supp. at p. 1157.[9]

The Ninth Circuit has had occasion, in two *en banc* decisions,[10] to consider the Fourth Amendment rights of parolees. These two cases, decided on the same day, produced a total of nine separate opinions, none of which found favor with a majority of the court. These cases reflect the tensions that arise from the interaction of Constitutional principles and the status of parolees, whose activities are restricted "substantially beyond the ordinary restrictions imposed by law on an individual citizen." *Morrissey v. Brewer,* 408 U.S. 471, 478, 92 S.Ct. 2593, 2598, 33 L.Ed.2d 484 (1972).

In *Latta v. Fitzharris,* the Ninth Circuit dealt with a state parolee who attacked his conviction, based upon narcotics seized by a parole officer during a warrantless search. The district court's denial of habeas corpus was affirmed. The plurality opinion by Judge Sneed held that parolees had certain Fourth Amendment privileges:

"It is thus too late in the day to assert that searches of parolees by their parole officers present no Fourth Amendment issues. Rather, such searches may be held illegal and the evidence obtained therefrom suppressed unless they pass muster under the Fourth Amendment test of reasonableness." 521 F.2d at pp. 248–249.

However, the opinion specifically rejects the necessity for a warrant; and, in the *Latta* plurality's view, the components of the "reasonableness" of a parole officer's decision to search may be subjective indeed:

"The parole officer ought to know more about the parolee than anyone else but his family. He is therefore in a better position than anyone else to decide whether a search is necessary. His decision may be based upon specific facts, though they be less than sufficient to sustain a finding of probable cause. It may even be based on a 'hunch', arising

from what he has learned or observed about the behavior and attitude of the parolee. To grant such powers to the parole officer is not, in our view, unreasonable under the Fourth Amendment. The principal protection against abuse of this authority is the 'helping' function of the parole officer's job, and the training that he has received to fit him for that job. A good parole officer does not regard himself as a policeman." 521 F.2d at p. 250.

The dissenting opinion, by Judge Hufstedler, urges that a warrant should issue, and criticizes the plurality's equation of a parole officer's "hunch" with reasonable cause:

"A warrant should issue to a parole officer to search his parolee's residence upon the officer's showing that the described home to be searched is the residence of his parolee, in which he lives alone or in the company of persons identified or otherwise described; that the parole officer has reasonable cause to believe that the parolee is violating, or is in imminent danger of violating, one or more specified conditions of his parole; and that he has reasonable cause to believe that evidence of such actual or impending violations will be found in the home to be searched. Evidentiary support for the probable cause showing need not meet the high standards of *Aguilar-Spinelli,* but it could not be based on the officer's hunches unsupported by articulated facts. Rather, the standard should be sufficiently flexible to accommodate the parole officer's supervisory obligations, but not so loose as to offer the parolee and his family no protection from arbitrary intrusions by the parole officer or from searches that are unjustifiably broad. To this end, the officer's showing need not be confined to evidence admissible in a courtroom. It could even include information from others whose reliability had not been tested." 521 F.2d at pp. 256–257.

---

9. Compare *United States v. Consuelo-Gonzalez,* 521 F.2d 259, 262–263 (9th Cir. 1975).

10. *Latta v. Fitzharris,* 521 F.2d 246 (9th Cir. 1975), *cert. den.,* 423 U.S. 897, 96 S.Ct. 200, 46 L.Ed.2d 130; *United States v. Consuelo-Gonzalez,* 521 F.2d 259 (9th Cir. 1975).

*Latta's* companion case, *United States v. Consuelo-Gonzalez,* reversed the conviction of a federal probationer, where drugs were found during a search conducted by a police officer. The district court had denied a motion to suppress the evidence, relying upon a condition of probation that the probationer "submit to search of her person or property at any time when requested by a law enforcement officer . . . ". The plurality opinion, again written by Judge Sneed, interpreted the Federal Probation Act:

" . . . to require that searches of probationers not otherwise in compliance with the usual standards of the Fourth Amendment be by, or under the immediate and personal supervision of, probation officers." 521 F.2d at p. 266.

Since the search in question was conducted by a police officer, "neither during the course of a probation visit by a probation officer nor pursuant to a proper warrant", the evidence was suppressed. The *Consuelo-Gonzalez* plurality stressed that different considerations would have arisen if the search had been made by a probation officer. Reiterating the views expressed in *Latta,* the plurality stated that searches by a probation officer, conducted pursuant to a prior condition of probation, "must necessarily meet the Fourth Amendment's standard of reasonableness", 521 F.2d at p. 262, a concept the plurality subsequently defined as a search "conducted in a reasonable manner and at a reasonable time by a probation officer," *id.* at p. 263; however, echoing the *Latta* plurality, the opinion goes on to state:

"Moreover, a thorough search of a probationer's residence incident to, or following, a probation visit is not dependent upon the establishment of probable cause. A reasonable belief on the part of the probation officer that such a search is necessary to perform properly his duties is sufficient. As we said in *Latta v. Fitzharris,* this belief may be based on a 'hunch' having its origin in what the probation officer has learned or observed about the behavior and attitude of the probationer." 521 F.2d at p. 266.

Judge Hufstedler, concurring specially,[11] agreed with the plurality opinion that:

" . . . a condition of probation that infringes a probationer's constitutionally protected right to be free from unreasonable searches and seizures cannot be deemed to be reasonable." 521 F.2d at p. 267.

She again criticized the plurality's failure to require a warrant, as well as its criteria of "reasonableness"; and concluded by observing that, as in *Latta:*

" . . . statutes and regulations applicable to the searching officer's conduct of searches of his charge are nonexistent." 521 F.2d at p. 268.[12]

While the most recent cases involve criminal prosecution subsequent to the seizure of incriminating material in the possession or control of a parolee, no basis is perceived for differentiating, within the Fourth Amendment context, between such a state of facts and those presented by the case at bar. The rationale of a suppression hearing is that Fourth Amendment rights

11. Judge Hufstedler's opinions in *Latta* and *Consuelo-Gonzalez* were joined in by Judges Browning and Ely.

12. In *Sperling,* n. 7 *supra,* Judge Kaufman expressed dissatisfaction with an absence of regulations governing the manner in which the New York parole authorities could conduct searches of parolees and their property:

"The interests involved when we balance individual liberty against the aim of reducing crime are difficult enough to define, and are perhaps even less receptive to evaluation and definition when applied to parolees. For that reason, as well as those I have already mentioned, I would prefer to have the Parole Board, the agency Congress has charged with striking that balance in the first instance, spell out in precise terms—before release— its determination that searches like the one to which Sperling was subjected were reasonable *in terms of both overall goals of parole and the dangers of harassment or worse.*

"Like my brother LUMBARD, however, I am unwilling at this time to say that the Parole Board's failure to set conditions for searches on parolees requires us to order Sperling released." 426 F.2d at p. 1168.

have been infringed. The evidence sought to be suppressed is the consequence of the alleged wrong, not the wrong itself. A suppression hearing is a technical procedure by which the charge of substantive wrong, in certain circumstances, must be made; but it does not follow that seizure of evidence and subsequent prosecution must take place before Constitutional rights can be vindicated. Thus, although no prior case under 42 U.S.C. § 1983 involving parolees' Fourth Amendment rights has been found, I conclude that the civil rights statutes afford an entirely appropriate vehicle for asserting their claims that those rights have been infringed.[13]

■ Nor do I perceive a basis for applying a different standard in respect of what the Fourth Amendment requires. At the very least, and without attempting on this motion a definitive statement of conditions, the searches reflected in the complaint were required to be "reasonable" if they were to conform to the Fourth Amendment. That is the thrust of all the recent cases; the differences in judicial expression have to do not with the requirement of reasonableness, but how that concept is defined. In *Latta* even the plurality opinion—which, as noted, did not define parolees' Fourth Amendment rights as broadly as the dissenters would have preferred—requires that the searching parole officer "reasonably believes that such search is necessary to the performance of his duties." 521 F.2d at p. 250. One of the parole officer's primary duties is to monitor any violations of parole. In order to justify a search, the parole officer must have "rea-

sonable grounds for investigation as to whether the defendant . . . was violating his parole", and the search must be "a proper incident of that investigation". *Santos, supra,* at 441 F.2d 1218, quoting with approval *People v. Santos,* 31 A.D.2d 508 at 509, 298 N.Y.S.2d 526 at 528 (1st Dept. 1969). As Judge Curtis held in *Coleman, supra,* at 395 F.Supp. 1159, "the mere fact of parole status alone" cannot justify a search; there must be subjective information, from other sources or from observation of the parolee's manner, giving rise to a suspicion founded in reason. Freed of geographical constraint, I am at liberty to choose between the several expressions of opinion in the Ninth Circuit; and I fully agree with Judge Hufstedler that a parole officer's "hunch" does not satisfy Fourth Amendment requirements.[14] Her formulation requires a showing:

" . . . that the parole officer has reasonable cause to believe that the parolee is violating, or is in imminent danger of violating, one or more specified conditions of his parole; and that he has reasonable cause to believe that evidence of such actual or impending violations will be found in the home to be searched." *Latta, supra,* at 521 F.2d 256–257.

Those requirements conform to the authorities in this Circuit, as I interpret them.[15]

The parties in their briefs discuss at length a paragraph which appears in the agreement which a parolee must sign in order to obtain release from prison. Paragraph 4 of the parole release agreement, 7 N.Y.C.R.R. § 1915.10(4), reads as follows:

---

13. This reasoning applies *a fortiori* to the families of parolees.

14. Roget's International Thesaurus (3rd ed. 1964) captures the essence of a "hunch":
 "hunch [coll., U.S.], presentiment, premonition [coll.], preapprehension, intimation, suspicion, impression, intuitive impression, feeling, forefeeling, vague feeling, funny feeling [slang]."
 Constitutional safeguards should not yield to vague and funny feelings. I do not deny that experienced parole officers may have valid "hunches"; but to justify searches the hunch must first be followed up in such a manner as

to develop a more substantial basis for the search.

15. Judge Hufstedler would also require a warrant in order to justify a parole officer's search. I need not determine on this motion whether the Fourth Amendment requires a warrant in parolee cases, since that question may be answered in the negative, and the plaintiffs nonetheless be entitled to relief if post-search evidentiary hearings reflect a lack of the requisite reasonable grounds. That is sufficient to dispose of defendants' motion for judgment on the pleadings.

"(4)(a) I will permit my parole officer to visit me at my residence or place of employment. (b) I will discuss with my parole officer any proposed changes in my residence, and I will not change my residence without prior approval of my parole officer. (c) *I understand that I am legally in the custody of the department and that my person, residence, or any property under my control may be searched by my parole officer or by any other representative of the board.* (d) If so directed, I will observe a curfew." (emphasis added).

In the case at bar, plaintiffs seek a declaration that paragraph 4(c) of the parole release agreement, as interpreted and implemented by defendants, is unconstitutional.[16] Defendants allege in their answer (¶¶ 15, 16) that ¶ 4(c) of the parole release agreement "and its predecessor merely reflect the plain sense and meaning" of such decisions as *Santos, supra,* and *Randazzo,* which as noted, and as defendants recognize in their answer (¶ 15), require that the parole officer "have reasonable grounds for investigation—e. g., a good faith belief that a parole violation has been committed."

 It is entirely clear that the manner in which defendants interpreted and implemented the search provisions of the parole release agreement pose questions of fact which must be resolved by trial. Defendants are not entitled to dismissal of the complaint, on the basis that the agreement constitutes a voluntary waiver by the parolee of Fourth Amendment rights, so that parole officers may conduct searches whenever they feel like it. As Judge Curtin held in *Coleman, supra,* the execution of this particular agreement by a parolee, in the

circumstances in which he finds himself, must be regarded as coercive and not voluntary, at least in respect of searches and seizures, which is the only section of the agreement under consideration in this case. Judge Curtin properly concluded in *Coleman*:

"The search was conducted arbitrarily and the evidence cannot be introduced unless the mere fact of parole status alone acts as a legal foundation for any search. That contention has not held sway in the recent cases in the Ninth Circuit or in this one in the past. *United States ex rel. Randazzo v. Follette,* 418 F.2d 1319 (2d Cir. 1969), cert. denied, 402 U.S. 984, 91 S.Ct. 1672, 29 L.Ed.2d 150 (1971); *United States ex rel. Sterling v. Fitzpatrick,* 426 F.2d 1161 (2d Cir. 1970)." 395 F.Supp. at 1159–1160.

On the other hand, the proof at trial may demonstrate that defendants are interpreting paragraph 4(c) of the parole release agreement as they allege in their answer, namely, that reasonable grounds must exist for the investigation and search; and plaintiffs may fail in their efforts to prove a pattern of conduct inconsistent with that general principle. In such a case, the complaint may well be subject to dismissal on the merits; but those underlying merits cannot be adjudicated on a motion for judgment on the pleadings.

In sum, the Court concludes that the amended complaint puts forward claims on behalf of the parolees and members of their family[17] which withstand the defendants' motion for judgment on the pleadings, and must be resolved at trial.

**16.** Defendants point out (main brief, p. 6) that prior to December 30, 1974, ¶ 4(c) of the parole release agreement concluded with the phrase "at its discretion", a phrase which was deleted by an amendment which became effective on that date. From this, defendants argue that there is no present case or controversy in respect of the present wording, since the plaintiffs all signed the earlier form. This argument lacks merit; deletion of the phrase "at its discretion" subtracted nothing of substance from the agreement.

**17.** Defendants argue (main brief, p. 17) that the family members' Fourth Amendment rights are modified "by virtue of their own status, that is, persons who share property or a residence with parolees." Accepting that proposition *arguendo,* some Fourth Amendment rights survive the family members' status, and the complaint poses triable issues of fact in respect of possible infringement of such rights.

## IV.

*Jurisdictional Basis for Plaintiffs' Claims Against Defendants Department of Correctional Services and Board of Parole*

The motion papers raise a number of other issues.

■ Defendants challenge this Court's jurisdiction over defendants State Board of Parole and Department of Correctional Services, on the ground that such entities are not "persons" under 42 U.S.C. § 1983. The contention is clearly correct, and there can be no § 1983 jurisdiction over these defendants, whether the relief demanded be viewed as legal or equitable. *City of Kenosha v. Bruno,* 412 U.S. 507, 511–513, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973).

Plaintiffs point out, however, that they have also asserted direct Fourth Amendment causes of action, invoking 28 U.S.C. § 1331(a) and § 1343(3) in aid of jurisdiction. *Bivens v. Six Unknown Agents of the FBI,* 403 U.S. 388, 390–395, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), holds that § 1331(a) provides a jurisdictional vehicle for the assertion of monetary claims (in excess of $10,000) which arise directly out of the Fourth Amendment. It has also been held that suits may lie, under § 1331, against a municipality, school district or other entities not amenable to suit under 42 U.S.C. § 1983. *Wright v. Houston Independent School District,* 393 F.Supp. 1149, 1192 (S.D. Tex.1975); see concurring opinion of Brennan, J. in *City of Kenosha v. Bruno, supra,* at 412 U.S. 516, 93 S.Ct. 2222.

■ It would appear, however, that the defendants Department of Correctional Services and Board of Parole are agencies of state-wide responsibility and control, so that the Eleventh Amendment would prohibit the enforcement of money judgments against them. *Wright, supra,* at 1152–1153.

Plaintiffs' brief in opposition to the present motion (p. 78) does not really contest that proposition; but they argue that the Eleventh Amendment interposes no bar to prospective injunctive relief in respect of the deprivation of Constitutional rights by state agencies. Reliance is placed upon *Edelman v. Jordan,* 415 U.S. 651, 654, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) and *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). I hold that this reliance is well placed,[18] and that 28 U.S.C. § 1343(3) furnishes a jurisdictional vehicle for the assertion of claims for prospective injunctive relief against these defendants. Accordingly their motion to dismiss the complaint for lack of subject matter jurisdiction is denied.

## V.

*Potential Liability of the Non-Parole Officer Defendants*

In addition to defendants who were parole officers at the times of the actions complained of, plaintiffs have sued supervisory personnel such as senior parole officers, directors of area offices, departmental commissioners, and the Chairman of the Parole Board. These defendants contend that the complaint fails to state causes of action against these defendants under 42 U.S.C. § 1983, for either damages or equitable relief.

■ The amended complaint, at ¶¶ 128–135, alleges that these particular defendants knew of the allegedly unconstitutional courses of action pursued by the parole officers; that they had the duty to correct and restrain such actions and failed to do so; and that such failure was "intentional, willful and reckless", and demonstrated "a deliberate indifference and an intentional disregard" of plaintiffs' rights. Whether or not such allegations can be established by the proof, they are sufficient to state a cause of action for damages

---

18. In *Wright, supra,* the court stated:
"The defendants in this case assert that the court lacks jurisdiction to grant a back-pay award to the plaintiffs should they win on the merits because the school district is to be construed as the 'state' for purposes of the eleventh amendment. There is really no serious question that prospective injunctive relief could be granted in this case. *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), *Edelman v. Jordan, supra.*" 393 F.Supp. at 1152.

against supervisory personnel under the cases decided by the Second Circuit. Where a prisoner's § 1983 complaint against a warden arises out of "a single spontaneous incident" involving a correctional officer, "unforeseen and unforeseeable by higher authority", and there are no allegations that the warden had authorized the officer's conduct, "or even that there had been a history of previous episodes requiring the warden to take therapeutic action", the complaint is insufficient in law, since liability cannot be predicated solely upon supervisory authority. *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir. 1973). However, the presence of such factors as were absent in *Johnson* will sustain a claim for damages under § 1983 against supervisory personnel. Thus the *Johnson* court stated:

> "The rule in this circuit is that when monetary damages are sought under § 1983, the general doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendant is required. Thus in *Martinez v. Mancusi,* supra, 443 F.2d at 924, we conditioned a conclusion of liability of the warden on a finding that he was personally 'responsible for what the guards did.' Again, in *Wright v. McMann,* supra, 460 F.2d at 134–135, in upholding a damage award as against Warden McMann, we stressed that 'there is every reason to believe that he was aware of segregation cell conditions,' and that 'responsibility for permitting such conditions to exist was ultimately, in any event, squarely his.'" 481 F.2d at 1034.

In the case at bar, the allegations in the complaint against the supervisory defendants are sufficient to state a cause of action when judged by these standards.[19]

The particular defendants also argue that equitable relief against them is foreclosed by *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). The holding in *Rizzo* is not applicable to the relief sought by the present plaintiffs. In *Rizzo,* a § 1983 class action against the mayor of Philadelphia, the police commissioner and others, alleging a pattern of unconstitutional police mistreatment of minority citizens, the district court, after trial, directed those officials to draft for the court's approval "a comprehensive program for dealing adequately with civilian complaints" to be formulated in accordance with the court's "guidelines" containing detailed suggestions for revising the police manuals and procedural rules for dealing with citizens and for changing procedures for handling complaints. The Supreme Court held that such an injunctive order, "significantly revising the internal procedures of the Philadelphia police department", 423 U.S. at 379, 96 S.Ct. at 608, was improvident.

■ The present plaintiffs, in their amended complaint, seek no injunctive relief. They pray instead for a declaration that certain regulations and acts be declared unconstitutional; and that the actors be cast in money damages. If plaintiffs' allegations in respect of totally arbitrary

19. *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), a § 1983 suit for money damages by students against school board members and administrators, holds (5–4) that, "in the specific context of school discipline", a school board member:

> " . . . is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student." 420 U.S. at 322, 95 S.Ct. at 1001.

Plaintiffs' reliance on *Wood* may be somewhat misplaced, in view of the different context.

The dissenters in *Wood* relied upon *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), in which "a considerably less demanding standard of liability was approved with respect to two of the highest officers of the State, the Governor and Adjutant General." That standard, according to Justice Powell's dissent in *Wood,* is:

> " . . . whether in light of the discretion and responsibilities of his office, and under all of the circumstances as they appeared at the time, the officer acted reasonably and in good faith." 420 U.S. at 330, 95 S.Ct. at 1005.

Under either standard enunciated in *Wood,* the present complaint at least alleges a cause of action for damages against the supervisory defendants.

and unreasonable searches are sustained by the evidence, nothing in *Rizzo* or other authority stands in the way of awarding to the plaintiffs the relief prayed for in the amended complaint.

Accordingly the motion to dismiss the complaint on behalf of the non-parole officer defendants is denied.

\* \* \* \* \* \*

Defendants, in their motion for judgment on the pleadings, make other arguments addressed to the form and sufficiency of the complaint. I have considered these additional contentions, find them without merit, and reject them without further discussion.

It remains to consider whether plaintiffs' prayer for class action certification should be granted, a question to which the Court now turns.

## VI.

### Class Action Certification

Plaintiffs seek certification, under Rule 23, F.R.Civ.P., in respect of two putative classes: (1) about 9500 individuals who are currently under the supervision of New York parole officers and about 20,000 individuals currently serving sentences in New York prisons who will become eligible for parole or conditional release; and (2) "several thousands" of individuals who reside or have resided with individuals released on parole or conditional release and under the supervision of New York parole officers.

Plaintiffs particularly invoke Rule 23(a),[20] 23(b)(1)(A), and 23(b)(2).[21]

Defendants, resisting class certification, contended initially that the determination should be deferred until rendition of the Court's decision on the defendants' motion for judgment on the pleadings. That pragmatic suggestion has now been resolved by the Court's denial of that motion.

We turn, therefore, to a consideration of class certification on its merits. Defendants put forward a number of arguments. The first is that the plaintiffs at bar comprise, in essence, a collection of claimants, each of whose claims must be decided separately according to the facts of his or her case. Defendants contrast such a case to "the typical and proper class action" (brief, p. 8), "in which a concededly uniform procedure is being applied to a group, or a state statute or regulation clearly applicable to a defined group is being challenged as invalid." Defendants point out, correctly, that they have never conceded the truth or existence of the policies and practices complained of by the plaintiffs, let alone that they are applied in a uniform fashion to any group at all. In view of these contested issues of fact, defendants argue (brief, p. 9) that "certification, if not denied, should be deferred until after discovery." [22]

Defendants also argue that the evidence as to the size of the class is at present only speculative; that there is no present showing that separate actions will in fact be brought if a class is not declared; that it would be impossible for this Court to make a finding "at this time" (brief, p. 12) that

---

**20.** "(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

**21.** "(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or . . .

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; . . . ."

**22.** Under this Court's prior order, discovery has also been deferred pending disposition of the motion for judgment on the pleadings.

defendants have acted on grounds generally applicable to a class; and, finally, that since any holding of this Court sustained on appeal would be binding on the state as to all similarly situated individuals, class certification is a formality which should be denied. In support of that final contention, defendants rely upon *Galvan v. Levine,* 490 F.2d 1255 (2d Cir. 1973), *cert. den.,* 417 U.S. 936, 94 S.Ct. 2652, 41 L.Ed.2d 240, and other authorities.

While it is true that in *Galvan* the Second Circuit affirmed denial of class certification under Rule 23(b)(2), the practical reasons underlying the denial were rather special. In *Galvan,* Puerto Ricans brought an action challenging a certain policy of the New York industrial commissioner in respect of denying unemployment benefits. The district court had not stated its reasons for denying the class action motion. The Second Circuit found sufficient basis for denial in the practical circumstances of the case:

> "The State has made clear that it understands the judgment to bind it with respect to all claimants; indeed even before entry of the judgment, it withdrew the challenged policy even more fully than the court ultimately directed and stated it did not intend to reinstate the policy.
>
> "The practical significance of the denial of class action designation was thus limited to the claim for a mandatory injunction ordering monetary restitution." 490 F.2d at 1261.

This limited significance of class action designation was further undermined by extreme practical difficulties in affording monetary restitution to persons outside categories recognized by the state.

The posture taken by state authorities in *Galvan* is considerably different from the posture adopted by the present defendants. Somewhat closer in point is *McDonald v. McLucas,* 371 F.Supp. 831 (S.D.N.Y.1974) (three-judge court), in which plaintiffs challenged the constitutionality of federal statutes governing the circumstances under which American armed forces personnel missing in action may be declared dead. Citing *Galvan,* the *McDonald* court observed that "the issue of the constitutionality of these statutes can be raised and determined in an action for a declaratory judgment and injunctive relief without the necessity of a class action", 371 F.Supp. at 833; the court went on to observe:

> "The court can properly assume that an agency of the government would not persist in taking actions which violate the rights of a service member's next of kin, if the statutes are declared unconstitutional." *Id.* at 834.

The Supreme Court affirmed *McDonald* without opinion. 419 U.S. 987, 95 S.Ct. 297, 42 L.Ed.2d 261.

By way of contrast, in *Cicero v. Olgiati,* 410 F.Supp. 1080 (S.D.N.Y.1976), Judge Lasker granted class certification to a suit by prisoners in New York state correctional facilities which challenged the standards and methods by which the New York State Board of Parole granted or denied parole. Judge Lasker concluded that the case satisfied the requirements of Rule 23(a) and 23(b)(2). He distinguished *Galvan* on the ground that, as in the case at bar, the state authorities had not manifested those indications of amelioration and acquiescence which the quotation from *Galvan, supra,* reflects. See discussion in *Cicero* at 410 F.Supp. 1099 n. 8.

In the circumstances of this case, I decline to deny class certification on the basis that it would be an unnecessary formality. However, I agree with defendants that, until discovery sheds further light upon the contested perimeters and facts of this dispute, final class certification should be deferred.

In these circumstances, the Court will enter a conditional order, pursuant to Rule 23(c)(1),[23] certifying this action as a class

---

**23.** Rule 23(c)(1) provides:

"As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits."

action pursuant to Rule 23(b)(1)(A) and 23(b)(2), the defendants remaining at liberty to move the Court, at a later date, that its order "be altered or amended before decision on the merits." Rule 23(c)(1). A provisional grant of class status pending further proceedings and the review contemplated by Rule 23(c)(1), was approved by the Second Circuit in *Sanders v. Levy,* 558 F.2d 636, 643 (2d Cir. 1976), *aff'd en banc,* 558 F.2d 646.

Much of Judge Lasker's analysis in *Cicero v. Olgiati, supra,* applies to the case at bar in respect of its suitability for class designation under Rule 23(a) and (b)(2); see discussion at 410 F.Supp. 1097–1099. *Cicero* involved a constitutional attack on New York Correction Law § 213, which specified the basis for parole release. Rejecting the defendants' contention that each parole decision turned on its own facts, Judge Lasker observed that "all plaintiffs have a common interest in assuring that the Board's decisions are made in a consistent, fair and rational manner." *Cicero,* 1098. The same rationale applies to the present defendants' conduct of post-release seizures. In the case at bar, certification is provisional at this time, rather than final as in *Cicero,* because in *Cicero* the statute under attack was there for all the world to see, while in the case at bar the very existence of the policy under attack is denied. In these circumstances, a further exploration of the merits, including discovery, is necessary to determine if the policy exists. If it should subsequently appear that the supervisory defendants were committed to Constitutional requirements of reasonableness in respect of parolee searches, and communicated appropriate instructions to parole officers which were, in certain cases disregarded, then defendants' contention that the case at bar presents nothing more than a series of individual claims is strengthened, and class certification may ultimately be deemed inappropriate. On the other hand, if the evidence supports the inference that parole officers as a matter of general practice or policy, disregarded Fourth Amendments rights of parolees and their families, the case for ultimate class certification would be considerably strengthened.

## CONCLUSION

Defendants' motion for judgment on the pleadings is denied. The parties are relieved of any restraint upon pre-trial discovery, which should go forward. The case will receive provisional class certification.

Submit order in conformity with this opinion on five (5) days' notice.